UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| EQT PRODUCTION COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 5:16-CV-150-JMH-REW |
| v. | ) | |
| | ) | |
| MAGNUM HUNTER PRODUCTION, | ) | MEMORANDUM OPINION AND |
| INC., | ) | ORDER |
| | ) | |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Plaintiff EQT Production Company (EQT) filed a formal motion on a portion of the subject matter at issue on the April 10, 2017, discovery dispute telephonic conference.[1] *See* DE ##49 (Motion for Reconsideration); 43 (Minute Entry Order). Defendant Magnum Hunter Production, Inc. (MHP), responded in opposition. DE #53 (Response). EQT replied. DE ##54, 55 (Reply). The matter is ripe for consideration. For the following reasons, the Court **DENIES** DE #49 and reconfirms the substance of the provisional ruling.

*Legal Principles*

In discovery, a party must disclose "a computation of each category of damages claimed" as well as make available "the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]" Fed. R. Civ. P. 26(a)(1)(A)(iii). Further, a "party who has made a

---

[1] To address the issue raised in DE #53, at 1 n.1, any non-challenged rulings in DE #43 "stand and resolve" those distinct disputes. The only portion of DE #43 at issue here is the preclusive ruling in the fourth paragraph. All other aspects of DE #43 continue to bind the parties unless and until a "formal motion surfaces" on those topics.

disclosure under Rule 26(a) . . . must supplement or correct its disclosure . . . in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process[.]" *Id.* 26(e)(1)(A). "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Id.* 37(c)(1). The Court may order additional or substitute sanctions. *Id.* 37(c)(1)(A)-(C). The Rule 37(d) exclusion basis, where applicable, likewise includes the potential for additional or substitute sanctions. *Id.* 37(d)(3) (cross-referencing Rule 37(b)(2)(A)(i)-(vi)).

The test for Rule 37(c) exclusion "is very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010);[2] *see also Acuity Brands Lighting, Inc. v. Bickley*, No. 5:13-CV-366-DLB-REW, 2015 WL 10551946 (E.D. Ky. Nov. 30, 2015)*, adopted by* 2016 WL 1171541 (E.D. Ky. Mar. 24, 2016). "Rule 37(c)(1) authorizes the trial court to exclude evidence that was withheld in violation of Rule 26(a) or (e). The party requesting exclusion under Rule 37(c)(1) need not show prejudice, rather the non-moving party must show that the exclusion was 'harmless' or 'substantially justified.'" *Saint Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 666 F. Supp. 2d 820, 826 (N.D. Ohio 2009). "The

---

[2] *Bessemer* requires robust damage-related production. Rule 26 requires "what [it] says"; it is insufficient to produce merely "enough evidence to put [Defendant] on notice" of a class or category of damages. 596 F.3d at 369. These contours make sense, given one of the Rule's aims: "Rule 26(a) generally serves to allow both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case." *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 871 (6th Cir. 2007).

exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004). Indeed, as the Circuit recently emphasized, "exclusion of late or undisclosed evidence is the usual remedy for noncompliance with Rule 26(a) or (e)," although the Court of course retains alternative options. *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015).[3]

What, then, does it mean for a mistake to be substantially justified or harmless? The Sixth Circuit explored that question in *Howe*, "adopt[ing]" the Fourth Circuit's five-factor test to "assess whether a party's omitted or late disclosure is 'substantially justified' or 'harmless[.]'" 801 F.3d at 747-48. The factors are: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Id.* at 748 (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014), and *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003));[4] *see also, e.g., Baker Hughes Inc. v. S&S*

---

[3] Further, "[o]nce it is determined that a party violated Rule 26 by making several untimely disclosures, a Court may strike those disclosures unless the party to be sanctioned . . . can show that those disclosure[s] were either harmless or substantially justified." *Matilla v. S. Ky. Rural Elec. Coop. Corp.*, No. 6:04-380-DCR, 2006 WL 7128675, at *4 (E.D. Ky. Jan. 20, 2006). "The burden to prove harmlessness or substantial justification shifts to the party to be sanctioned once a violation of Rule 26 has been shown." *Id.* at *2.

[4] The Circuit also instructs that an omission is harmless if it involves "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Vance, by and Through Hammons v. United States*, 182 F.3d 920, No. 98-5488, 1999 WL 455435, at *5 (6th Cir. June 25, 1999) (table); *see also, e.g., James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, No. 5:11-374-DCR, 2014 WL 1664263,

*Chemical, LLC*, 836 F.3d 554, 568-69 (6th Cir. 2016); *Smith v. State Farm Mut. Auto. Ins. Co.*, No. 5:15-375-KKC, 2017 WL 107971, at *2 (E.D. Ky. Jan. 11, 2017) (applying the factors); *Bentley v. Highlands Hosp. Corp.*, No. 15-97-ART-EBA, 2016 WL 5867496, at *10 (E.D. Ky. Oct. 6, 2016) (characterizing the five factors as "flesh[ing] out" *Bessemer*'s "simple test"). As Judge Thapar put it: "The factors simply lend themselves to the task at the heart of Rule 37(c)(1): separating 'honest,' harmless mistakes from the type of 'underhanded gamesmanship' that warrants the harsh remedy of exclusion." *Id.*

That said, though, Rule 37(c)(1) still "requires absolute compliance with Rule 26(a), that is, it mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 730 (S.D. Ohio 2014). As EQT emphasizes and the Court recognizes, Rule 37(c)(1) provides for "less draconian options" than exclusion in appropriate circumstances. *Id.* The Rules and the unfolding discovery process, though, give many opportunities to timely correct a prior inadequacy or seasonably supply equivalent information. The later the disclosure, the smaller the margin of error and greater the peril. The Sixth Circuit deferentially reviews district courts' decisions on these matters under an abuse of discretion standard. *Howe*, 801 F.3d at 747.

*Analysis*

The Court previously excluded, "as a preclusive sanction under Rule 37(c) and (d), from further proceedings in this case any evidence on which EQT relied to make a

---

at *10 (E.D. Ky. Apr. 25, 2014). *Howe* retained this formulation, though the factors now primarily guide the inquiry. 801 F.3d at 747.

4

damages calculation that EQT did not produce to [MHP]." DE #43. The Court "h[e]ld EQT to what EQT . . . produced," including through exclusion of any "unproduced backup documentation." *Id.* In sum, the Court "fr[o]ze EQT's damage proof at what it in fact ha[d] provided to [MHP]." *Id.*

EQT does not dispute that there is a category of information (summarized as "backup" or other information from the Enertia database to support its damages calculation) that it did not timely produce (and did not so dispute in the informal discovery dispute resolution setting). *See, e.g.*, DE ##49, at 8 (stating that "EQT provided MHP with a report from Enertia" only on April 25, 2017, well after the 3/23/17 Bergonzi deposition and 3/1/17 discovery cutoff); 54, at 6 ("The crux of [MHP]'s argument is that EQT did not provide Enertia data that supports its damages calculations to MHP until after Mr. Bergonzi's deposition. **EQT has since provided that data to MHP**." (emphasis added)); 54-1 (West Affidavit), at ¶ 24; 49-1, at 6 (Bergonzi Depo. p. 113) ("[Y]ou used some Enertia records in-house to come up with those numbers?" "Yes." "And those documents have never been provided to us. The backup for that has never been provided to us in this case, but you're going to go back and look for that?" "**I'm sure we have backup for that.**"); *id.* at 7 (Depo. p. 119) ("[W]e can substantiate how we calculated those numbers.").[5]

---

[5] MHP specifically asked for damages-related (and much more) information in the Requests for Production served in mid-November 2016. *See* DE #53-2; *see also* DE #53, at 2. Further, and separate from the Rule 34 basis, EQT had an independent obligation, per Rule 26, to make available "the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]" Fed. R. Civ. P. 26(a)(1)(A)(iii). EQT vaguely referenced some "internal accounting completed by EQT" in its initial disclosures, *see* DE #53-1, at 7, but EQT manifestly did not otherwise meet its obligations during discovery relative to the Enertia data. *See also* DE #53, at 2 & 2 n.2.

Though EQT's Complaint and Rule 26 initial disclosure provided some damage figures, the disclosure did not in any way detail the computation. EQT most certainly did not make available to MHP the underlying Enertia ESI or any spreadsheets generated as back-up for the figures—Rule 26 plainly requires this as to "the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Fed. R. Civ. P. 26(a)(1)(A)(iii). Notably, the initial disclosure, at DE #53-1, nowhere lists Enertia data or spreadsheets from Enertia as documents or ESI in EQT's possession that it may use "to support its claims," again counter to the Rule 26(a) dictates. Later, by detailed and overlapping document requests, MHP sought, through many formulations, all evidence related to or supporting the damage claims. None of those triggered production of Enertia records. Heading into the Rule 30(b)(6) depositions, EQT knew it was to designate and prepare a witness to discuss damages. Despite all of that history and the many instances of required disclosure or response, EQT produced its designee and mouthpiece Bergonzi for deposition, having not produced to MHP the Enertia records, substantiating spreadsheets, or the work papers underlying the damage amounts. As Plaintiff, EQT had used the materials to formulate its Complaint (and its pre-complaint POC in bankruptcy). Still, EQT simply ignored that cache of records, as a matter of discovery, until Bergonzi testified, a point well after the formal discovery close. When first before the Court, EQT insisted that the discovery requests had not encompassed Enertia materials and that EQT had timely produced all the Rules required. *See* Audio File No. KYED-LEX__5-16-cv-150-JMH-REW_20170410_105000, at 15:30.

EQT seeks refuge in Rule 37's "unless" clause: it endeavors to establish that the discovery failure was "substantially justified" or "harmless," so as to militate against the remedy of exclusion. *See, e.g.*, DE #49, at 6. Whether the failure was substantially justified or harmless is a question on which EQT has the burden. *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003); *Blair v. GEICO Gen. Ins. Co.*, 917 F. Supp. 2d 647, 656 (E.D. Ky. 2013). Because the *Howe* factors govern the analysis, the Court examines each.

**The surprise to MHP.** The Court, in these circumstances, sees plain surprise to MHP. MHP directly asserted its surprise. DE #53, at 10. In MHP's view, "Bergonzi could not explain how he came up with even the place-holding numbers except by vague references to Enertia reports he ran in February 2016 and yet had not produced by the time he was deposed more than a year later, in March 2017." *Id.* The Court recognizes MHP's surprise concerns as valid in this scenario.

The Court has reviewed every tendered page of the Bergonzi deposition (indeed, of every exhibit tendered) and agrees with MHP on the issue. Apparently, little (if anything) Enertia-related had been exchanged in discovery prior to the Bergonzi deposition, despite the database's apparent empirical centrality (per Bergonzi, EQT's speaker) to EQT's damages calculation.[6] Bergonzi had to explain the basics of Enertia, *see* DE #49-1, at 3-4, and "[w]hen" Bergonzi "mentioned Enertia . . ., a bell went off in [EQT counsel's] head that maybe we can . . . go back and look there" for responsive information. *Id.* at 3 (Depo. p. 88). Ms. Chesnut agreed that the topic of damages was

---

[6] MHP had notified EQT that the "amount of damages" and the "calculation of same" would be matters of examination during the 30(b)(6) deposition. *See* DE ##29, 32, at ¶ 2; *see also id.* at ¶¶ 11-13.

"hard to talk about without something in front of us to understand what the Enertia system was." *Id.* at 4 (Depo. p. 92). Enertia seemed largely unexplored to both sides at the deposition. If a bell was sounding for EQT, imagine the clear surprise to MHP's defense.

Bergonzi directly said that EQT "used some Enertia records in-house to come up with th[e damages] numbers." DE #49-1, at 6 (Depo. p. 113). Although, per MHP counsel, "those documents [were] never provided," Bergonzi was "sure we have backup for that." *Id.* EQT "came up with" the $2,368,349 figure by "going back through [the] Enertia documents." *Id.* It similarly "came up with" the $831,909 figure "through [the] Enertia records." *Id.* (Depo. pp. 113-14). EQT forced MHP to conduct the 30(b)(6) without access to the substantiating records. Adding to the surprise, these were damage claims first raised only in this lawsuit: "EQT had never made a claim on Magnum Hunter for any of those two amounts." *Id.* (Depo. p. 114).

Bergonzi made clear that EQT independently supplemented the Mercadante audit with "a query to the Enertia system" to calculate damages. DE #49-1, at 9 (Depo. p. 175). Although "Mercadante did its work, . . . [Bergonzi] and EQT internally came up with the rest of what comprises the claims that are spelled out in the complaint." *Id.* In fact, "to prepare the proof of claim, EQT (in a comment reflecting the contribution of the largely unknown Enertia) "quer[ied] the system to empty the buckets for revenues and gathering and compression by month," resulting in "a worksheet that supports these numbers." *Id.* at 12 (Depo. p. 185). Only with that worksheet, not provided to MHP, "could [EQT] understand how we had built up the claim." *Id.* (Depo. p. 186). Ms. Chesnut was explicit: "Well, I don't want to purport to understand here today how you did it. . . . [W]e don't

have the backup is what I'm saying." *Id.* These comments, consistent throughout the deposition, plainly show that the topic of Enertia records was new to and would surprise MHP.

The raw data inputted into Enertia may well have (and apparently did) originally come from MHP, as EQT argues at length, *see, e.g.*, DE #49, at 9-11, but MHP was not aware of how EQT had processed the information, how Enertia treated, computed, or utilized it, how EQT used it to calculate damages, and the like. *See* DE #49-1, at 4, 6, 7, 9, 12 (Depo. pp. 92, 113-14, 119-20, 175, 185-86). For that matter, neither was Bergonzi, at the deposition. *See id.* at 6, 7 (Depo. pp. 113-14, 119, 120) (referencing, *e.g.*, "numbers . . . generated off Enertia reports"). A court abuses its discretion if it excludes evidence when the receiving party "had all the information relevant to the computation of damages in its possession and had a full opportunity during [the] deposition to question [the deponent] about damages." *Howe*, 801 F.3d at 748 (internal quotation marks removed). That is not the case here, where MHP (and even Bergonzi) did not have the Enertia records—which EQT affirmed was the basis for much of its damages calculation, DE #49-1, at 6, 7, 9, 12 (Depo pp. 113-14, 118, 120, 175, 185-86)—in its possession and where MHP did not have a full (or really any) opportunity during Bergonzi's deposition to question him about the Enertia-based damages calculation. *See, e.g.*, *id.* at 6, 7 (Depo. pp. 113, 119) ("I'm sure we have backup for that."; "[W]e can substantiate how we calculated those numbers.").[7] Nearly eight months into the case, and after discovery closed, Bergonzi, EQT's representative, swore to a damage basis previously undisclosed to MHP, could provide no concrete details, and merely promised future substantiation of

---

[7] Bergonzi's testimony is strikingly similar (though not, of course, identical) to Sheffield's in *Acuity*. *See* 2015 WL 10551946, at *3-*4 (excluding evidence).

claims that should have been provided months earlier. The Enertia dynamic easily constitutes much more than using "simple math." *Howe*, 801 F.3d at 748; *see, e.g.*, DE #49-1, at 12 (Depo. p. 185-86) (Bergonzi describing "query[ing] the system to empty the buckets for revenues and gathering and compression by month," requiring review of a "huge Excel spreadsheet" for adequate comprehension).

The Civil Rules, simply put, "do not require parties to read minds." *Bentley*, 2016 WL 5867496, at *10. Bergonzi testified that the Enertia documents were central to and the basis of much of EQT's damages calculation, yet EQT did not timely produce those records, and MHP could not question Bergonzi on the contents. For all the reasons discussed, the Court plainly sees surprise in EQT's late production of the Enertia records.

**Ability to cure the surprise and the extent to which allowing the evidence would disrupt the trial.** EQT apparently attempted to mitigate the surprise by producing, post-deposition and post-discovery-close, the at-issue Enertia records. The Court finds that action, considering all the circumstances, inadequate to "cure" the surprise and to avoid disruption.

As in *Bentley*, the information here "came only *after* [the] scheduled deposition." 2016 WL 5867496, at *10 (emphasis in original). Just as the defaulting party did in *Bentley*, EQT responds that "the Court could reopen discovery." *Id.* at *11. Apart from the potential future discovery disputes and delay that step could prompt (important considerations themselves), such a solution "would also reward [EQT] for [its] untimeliness and suggest that deadlines bend to a party's will." *Id.* EQT's meager offering of more discovery and scheduling uncertainty here "does nothing to explain [the prior] delay or account for either the deadlines that have passed or those that draw nearer

each day." *Id.* Indeed, here, discovery has been closed for months. Dispositive motions are due within days; numerous pretrial deadlines loom, and trial is a mere 3 months away. Instead, EQT's proposal "would invite dilatory tactics and discovery abuse" and "do nothing to 'secure the just, speedy, and inexpensive determination' of this case." *Id.* (quoting Fed. R. Civ. P. 1). MHP perceives this and quite reasonably expresses a reluctance to expend "enormous time and expense in deposing Mr. Bergonzi **again** on documents produced after discovery closed." DE #53, at 11 (emphasis in original). The Court agrees with this District's conceptualization in *Bentley* and MHP's argument here that EQT's proposal, in the circumstances, "surely fails the *Howe* idea of 'cure[.]'" *Id.*

Harm should be assessed based on the realities of the situation, the case status, and the schedule. Thus, in almost every situation of nondisclosure, a court willing to move mountains could fashion a remedy to mitigate harm. That might mean re-writing the schedule, reopening discovery, and shifting all resultant costs to the offending party. The Court does not view theoretical mitigation, only by major surgery on case posture, as fairly contemplated by the harm assessment. In other words, if the nondisclosure would require significant compromise in the status and schedule of a case, or would require consequential management in terms of discovery costs, burdens, and sequence, then the failure to disclose has indeed caused harm beyond the unilateral curative powers of any party. *See, e.g.*, *Dayton Valley Investors, LLC v. Union Pacific R. Co.*, No. 2:08-CV-127-ECR-RJJ, 2010 WL 3829219, at *6 (D. Nev. Sept. 24, 2010) ("Multiple courts within the Ninth Circuit have found that the failure to provide a computation of damages or identify the witness who will testify regarding damages within the discovery period is not harmless for purposes of Rule 37(c) precisely because it results in the need to reopen

discovery."); *Ketab Corp. v. Mesriani Law Grp.*, No. 14-07241-RSWL-MRW, 2016 WL 5921767, at *3 (C.D. Cal. Mar. 18, 2016) ("Plaintiff's failure to provide a computation of damages is not harmless precisely because it results in the need to reopen discovery."). As one court remarked, in response to the argument that reopening discovery would solve any harm: "But, if that is so, no failure to disclose would ever be harm[ful] because there will always be a way to reschedule something to accommodate the failure to disclose. . . . If the court were to accept such an argument it would all but forfeit the ability to effectively manage litigation." *In re Rybolt*, 550 B.R. 422, 427 (Bankr. N.D. Ind. 2016). Simply put, there is harm in case disruption, paired with the attendant negative effects on the non-defaulting and innocent party.

As to trial disruption, unlike in *Howe*, the issue here has not "brought the parties closer to agreement." 801 F.3d at 748. Cross-examination at trial would likewise not sufficiently cure the patent surprise or portend a smooth trial; *Howe* addressed a quite unique, *re*trial issue, wholly distinct from the status of this case. *Id.* The time for MHP to be able to query EQT regarding damages was—armed with discoverable documents—at the Bergonzi 30(b)(6) deposition; EQT's proposed cross-examination alternative, DE ##49, at 12; 54, at 10, would improperly force MHP to wait until trial to get answers to and explanations of critical questions to which it was entitled during discovery. Additionally, given the approaching September 2017 trial date, along with the cascading pretrial deadlines, MHP is right that EQT improperly seeks to force MHP to "spend the next few months reviewing EQT's 'backup' documentation or re-deposing Mr. Bergonzi" "instead of preparing for trial" while EQT "actually gets to prepare for trial." DE #53, at 11. Case deadlines exist for many reasons, one of which is guiding the just, efficient, and

methodical resolution of the case by providing the parties a level playing field for hashing out the case questions. EQT would upset that balance here. The Court finds EQT's proposal to be disruptive to the trial and to fair and orderly trial preparation.

**The importance of the evidence.** EQT asserts, DE #49, at 12, and the Court perceives Enertia data importance here, as did the *Howe* and *Bentley* courts regarding the evidence at issue in those cases. MHP does not argue against proof importance (and to the contrary, seeks the proof's exclusion, stating that the "importance to the defense" of this evidence "cannot be over-stated"). DE #53, at 11. The at-issue Enertia records are important.

This, in a sense, cuts both ways. The more important the proof, the greater the effect of preclusion, but also the greater the harm in tardy disclosure. *Compare, e.g.*, *Bentley*, 2016 WL 5867496, at *11 (perceiving this factor as "cut[ting] in the [nondisclosing party]'s favor" when the at-issue records were "important" and "significant")*, and Redmond v. United States*, 194 F. Supp. 3d 606, 614 (E.D. Mich. 2016) (same)*, with, e.g.*, *In re Cox Motor Express of Greensboro, Inc.*, No. 14-10468, 2016 WL 6661318, at *5 (M.D.N.C. Nov. 4, 2016) ("[T]he [vital] importance of the evidence weighs in favor of finding that Defendant's failure to disclose was not substantially justified or harmless."); *Etheridge v. E.I. DuPont De Nemours & Co., Inc.*, No. 14-CV-2443-SHL-cgc, 2015 WL 12516227, at *3 (W.D. Tenn. Oct. 14, 2015) ("[B]ecause this evidence is so important to Plaintiff, her explanation for her failure to abide by . . . the Federal Rules of Civil Procedure becomes even less satisfactory."); *see also, e.g.*, *Exclaim Mktg., LLC v. Directv, LLC*, No. 5:11-CV-684-FL, 2014 WL 12626359, at *3 (E.D.N.C. Nov. 18, 2014) ("The fourth factor, concerning the

importance of the evidence, must be viewed from the perspective of both parties, and the fact that certain evidence is helpful to a party's case in the eyes of the jury also shows why it should have been disclosed in a timely manner." (internal quotation marks removed)). Regardless, importance "cannot, by itself, save improperly disclosed evidence from being found unjustified or non-harmless." *Samsung Elecs. Co., Ltd. v. Nvidia Corp.*, 314 F.R.D. 190, 197 n.6 (E.D. Va. 2016).

**EQT's explanation for its failure to disclose the evidence.** This factor is the "one that speaks directly to whether [EQT]'s untimely disclosures were 'substantially justified.'" *Bentley*, 2016 WL 5867496, at *11. EQT has not here offered a persuasive, substantial justification for its delay, so the Court "cannot say that" EQT's discovery failure here was merely an honest mistake. *Bentley*, 2016 WL 5867496, at *11 (citing *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003)).

EQT offers nothing convincing concerning its management of the Enertia evidence.[8] EQT, as the Plaintiff, the master of its claim, and the party making its own damages calculation, should have been well aware, early in the case, of the basis for that calculation. Bergonzi (EQT's speaker) said the basis was largely Enertia reports—they were literally what EQT had previously "used . . . to come up with those numbers," DE #49-1, at 6 (Depo. p. 113)—but, for reasons not clear on this record, EQT, despite

---

[8] EQT's motion says that it "first addresses . . . why it did not produce the information at issue." DE #49, at 6. The Court sees no such explanation, however. Rather, EQT merely explains the background and states that it "*has now* created reports from Enertia that it produced to MHP." *Id.* at 7 (emphasis added). The Court finds it odd that EQT tries to distinguish Enertia data / product from "documents" in its possession. Surely the Rules equate paper and ESI in terms of disclosure and discovery response obligations. EQT had and used the Enertia materials to formulate its claim and then shelved the reference materials throughout the discovery process. This is not explicable through torture of the term "document."

multiple triggering rules or events, had simply not gathered or produced those documents during discovery or in advance of the deposition. Indeed, the damage basis even seemed to be news (a "bell went off in my head") to EQT's counsel.[9]

EQT also makes a suggestion that it thought there was no dispute on Enertia-related discussion. *See, e.g.*, DE #49, at 8. This rings hollow, to the Court. A cursory review of the Bergonzi deposition transcript reveals MHP's repeated statements of need for the Enertia information and of confusion concerning the damages calculation without it. EQT's counsel, and indeed EQT's representative himself, made repeated promises to go back and find the referenced Enertia data post-deposition. A dispute plainly persisted at and after the Bergonzi deposition. Indeed, the parties jointly began the discovery dispute resolution process a mere 4 days after the deposition, *see* DE #41 (Order), seemingly prompted by a 3/27/17 email from MHP's counsel that explicitly included broad concern over "the corporate deposition we took last week." DE #54-22. EQT had not supplemented as of the call. On that call, EQT claimed it had produced all required records. Not until two weeks after the provisional ruling did EQT supplement. Additionally, as to some of EQT's arguments, "faith—good or bad—is not relevant [to] the substantial justification component or the harmless component of a *Southern States*

---

[9] To the extent EQT claims a broad work-product protection justification, DE #49, at 8, the Court finds the reason unpersuasive. First, of course, the parties never raised a work-product dispute with the Court and have never briefed the contours of the doctrine's applicability here. Just as importantly, though, EQT dropped the potential work-product shield defense post-deposition, eventually turning Enertia records over to MHP. A reason (never briefed or adjudicated) EQT hurriedly abandoned post-deposition does not strike the Court as a substantial justification for pre-deposition nondisclosure. *See also* DE #49-1, at 10-11 (Depo. pp. 180-81). The Court reviewed the audio of the April 10 telephone conference; EQT never mentioned work product as a factor in managing Enertia materials.

[*i.e.*, *Howe*] analysis." *Samsung*, 314 F.R.D. at 199 (citing cases).[10] "Instead, 'explanation' looks to the objective circumstances surrounding the nondisclosure. In that sense, 'explanation' looks more at the feasibility of full and timely disclosure than it does at parties' intent." *Id.* at 199-200 (internal citations removed).

All told, "[u]nder Rule 37(c)(1), forgiveness must be earned," and it "neither comes automatically nor easily." *Bentley*, 2016 WL 5867496, at *11. For the reasons discussed, EQT earns no relief here. Unlike *Howe*, this discovery period was no "rushed, confusing nightmare" in which counsel's honest mistake explained the failure to produce. 801 F.3d at 749. Unlike *Howe*, the district court did not here "cause[] some of the confusion," such as by "set[ting] short deadlines for discovery." *Id.* at 750. This case did not have a "hurried" discovery period and has not been marked by "rancor between the parties." *Id.* The attorneys have not played "childish withholding game[s.]" *Id.* It was this confluence of factors, none of which are present in this case, that led the *Howe* court to determine that the district court "overreact[ed]" and abused its discretion in ordering exclusion. *Id.* This case is dissimilar to *Howe*.

Rather, the issue here is straightforward: EQT untimely produced a category of Enertia documents / information, central to its damages calculation. The question is: what should the consequence of that be? The Court has considered all *Howe* factors and

---

[10] "Bad faith is explicitly <u>not</u> one of the *Southern States* [*i.e.*, *Howe*] factors. *E.g.*, *Southern States*, 318 F.3d at 596 ('excluding evidence only when the nondisclosing party acted in bad faith would undermine the basic purpose of Rule 37(c)(1): preventing surprise and prejudice to the opposing party'); *Rambus, Inc. v. Infineon Technologies, AG*, 145 F. Supp. 2d 721, 725-27 (E.D. Va. 2001)." *Samsung*, 314 F.R.D. at 197 n.7 (emphasis in original). Indeed, *Rambus*, the case on which the Fourth Circuit ultimately relied for the 5-factor formulation, stated that "the plain language" of Rule 37(c) "contains no requirement for bad faith or callous disregard of the discovery rules." 145 F. Supp. 2d at 727.

concludes, for all the reasons discussed, that EQT's failure neither was substantially justified nor harmless. Accordingly, the consequence should be and is the "usual" Rule 37 remedy: exclusion of the tardily-produced proof.[11]

Again, the Court simply freezes EQT where it happily stood at the time of the Bergonzi deposition. EQT had elected not to identify Enertia records as discoverable or produce Enertia materials through the entire discovery period. As EQT's spokesman explained damages, he acknowledge the role of Enertia as the information "repository" used to "substantiate" any royalty issue. DE #49-1, at 3 (Depo. p. 86). He agreed Enertia spreadsheets backed up the damage claims and Enertia records "support[] these numbers." *Id.* at 12 (Depo. p. 185). Despite a Rule 26(a) duty, a Rule 26(e) duty, multiple Rule 34 duties, and the obligations of Rule 30(b)(6), EQT ignored all and required MHP to depose its corporate spokesman on damages without the substantiating information. Then, to the Court in April, EQT claimed the requests for production did not cover Enertia and that EQT had produced all the Rules required of it. EQT may have rethought that weeks later, in a late salvo of supplementation, but the Court views it as right to make EQT walk the trail it volitionally chose. Discovery is closed. EQT has not justified nor proven as harmless its failures to disclose. As such, EQT should not be permitted to use in any proceeding damages proof it had not supplied as of the Bergonzi deposition.

---

[11] The Court considered the totality and concludes that a sanction less than exclusion is not adequate. In these circumstances, a mere fee award or jury advisement would insufficiently account for the Rule 26 and 37 values, and no other (b)(2)(A) sanction fits these facts. The Sixth Circuit has described exclusion here as "mandatory" and "usual." EQT risked an exacting sanction when it failed to seasonably comply with its discovery obligations regarding central damages-related evidence, waiting until post-30(b)(6) deposition and post-discovery-close to produce proof its speaker described as the basis for much of its significant damages claim.

*Conclusion*

For these reasons, the Court **DENIES** DE #49 and affirms the provisional ruling.

\* \* \* \* \*

The Court issues this Order resolving a non-dispositive[12] pretrial matter under 28 U.S.C. § 636(b)(1)(A). Any party objecting should consult the statute and Federal Rule of Civil Procedure 72(a) concerning its right of and the mechanics for reconsideration before the District Court. Failure to object waives a party's right to review.

This the 25th day of May, 2017.

**Signed By:**

**Robert E. Wier**

**United States Magistrate Judge**

---

[12] The Court treats (and treated) the matter as non-dispositive because, unlike in *Acuity*, there is no suggestion here that the exclusion DE #43 countenanced was dispositive as to any specific claim. *See* 2015 WL 10551946 (stating, "The preclusion of Rule 37(c)(1) generally aims at barring evidence, not at whole claims," but, on the facts, recommending a harsher (b)(2)(A) sanction prohibiting "supporting . . . designated claims"). The Court here excludes a mere subset of evidence, not a claim.