UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | | |
|---|---|---|
| EQT PRODUCTION COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Action No. 5:16-cv-150-JMH |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| MAGNUM HUNTER PRODUCTION | ) | **AND ORDER** |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

\*\*\*\*

## I. INTRODUCTION

This matter is before the Court upon Defendant Magnum Hunter Production Company's Motion for Partial Summary Judgment [DE 23] and Motion for Summary Judgment [DE 62], as well as Plaintiff EQT Production Company's Motion for Partial Summary Judgment [DE 63]. All Motions have been fully briefed a

nd are ripe for the Court's review. [DE 27, 28, 48, 52, 62, 63, 67, 68, 71, 72]. For the reasons stated herein, **IT IS ORDERED** that Magnum Hunter's Motion for Partial Summary Judgment is **GRANTED**, while the Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. EQT's Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

EQT and Magnum Hunter are in the business of producing and selling oil and natural gas. [DE 1, p. 1-2, ¶ 1-6]. Between 1996 and 2002, the predecessors in interest of both companies entered into eleven Farmout Agreements ("FOAs") which allocated exploration and drilling rights on lands situated in Eastern Kentucky.[1] [*Id.* at p. 2-5, ¶ 9]. Specifically, the FOAs allowed Magnum Hunter to drill wells on lands owned or leased by EQT and sell oil and/or gas produced from those wells.[2] [DE 1-1, 1-2, 1-3, 1-4, 1-5, 1-6, 1-7, 1-8, 1-9, 1-10, 1-11]. In exchange, EQT would receive a royalty, amounting to a percentage of "8/8 of the gross proceeds received from the sale of oil and/or gas produced from wells drilled hereunder without deductions of any kind."[3] [DE 1-1, p. 6, ¶ 4A].

---

[1] Having established that EQT's and Magnum Hunter's predecessors in interest entered into the FOAs and that EQT and Magnum Hunter subsequently assumed responsibility for the obligations set forth in the FOAs, the Court will hereinafter refer to the contracting parties as EQT and Magnum Hunter for ease of reference.

[2] A farmout agreement is "[a] very common form of agreement between operators, whereby a lease owner not desirous of drilling at the time agrees to assign the lease, or some portion of it (in common or in severalty) to another operator who is desirous of drilling the tract." Williams & Meyers, *Oil and Gas Law*, Manual of Terms. "The primary characteristic of the farmout is the obligation of the assignee to drill one or more wells on the assigned acreage as a prerequisite to completion of the transfer to him." *Id.*

All of the FOAs obligated Magnum Hunter to drill test wells within a given time period, while complying with a host of geological requirements, in order to complete the transfer of rights. [*See* DE 1-1, p. 4-6, ¶ 3A-F].

[3] The percentage used to calculate the royalties varies between the FOAs. For instance, the 4/12/96 FOA reserves a royalty interest equal to 12.50% of 8/8 of the gross proceeds, while the 12/1/98 FOA reserves a royalty interest equal to 1/16 of 8/8 of the gross proceeds. [DE 1-1, p. 6, ¶

Notwithstanding the general prohibition on deductions, eight of the FOAs specifically authorized Magnum Hunter to deduct EQT's "proportionate share of applicable severance tax" from the royalty payments.[4] [DE 1-1, p. 17; 1-2, p. 8-9, ¶ 4B; 1-3, p. 9, ¶ 4B; 1-4, p. 12, ¶ 4D; 1-5, p. 12, ¶ 4D; 1-6, p. 9, ¶ 4B; 1-7, p. 40; 1-8, p. 8, ¶ 4D]. Two of the FOAs provided for escalation of overriding royalties "[u]pon the payout of the first two (2) wells drilled and completed as a well capable of production in paying quantities."[5] [DE 1-1, p. 6-7, ¶ 4A; 1-7, p. 7-8, ¶ 4A]. All of the FOAs required Magnum Hunter to pay EQT a shut-in fee for each well capable of production that it closed for an extended period of time.[6] [DE 1-1, p. 8-9, ¶ 7A; 1-2, p. 11, ¶ 7B; 1-3, p. 12, ¶

---

4A; 1-4, p. 9, ¶ 4A]. The phrasing of the royalty provisions also varies somewhat. For example, the 4/12/96 FOA language is rearranged in the 1/14/98 FOA to state that EQT was entitled to a percentage of the proceeds received "by [Magnum Hunter] from the sale of oil and/or gas, without deductions of any kind, produced from wells drilled hereunder." [DE 1-2, p. 8, ¶ 4A]. However, the substance of the royalty provisions is consistent throughout the FOAs.

[4] A severance tax is "[a] tax on the removal of minerals from the ground, usually levied as so many cents per barrel of oil or per Mcf [a thousand cubic feet] of gas." Williams & Meyers, *Oil and Gas Law*, Manual of Terms. It may also be "levied as a percentage of the gross value of the minerals removed." *Id.*

Two of the FOAs made no mention of severance tax deductions, but attached and incorporated by reference an Agreement and Assignment of Operating Rights, discussed *infra*, which authorized severance tax deductions. [DE 1-1, p. 17; 1-7, p. 40].

[5] An escalation clause is "[a] clause in a gas purchase contract providing for progressive increases in the price to be paid on gas during the term of the contract." Williams & Meyers, *Oil and Gas Law*, Manual of Terms.

[6] A shut-in royalty is "[a] payment made when a gas well, capable of producing in paying quantities, is shut-in for lack of a market for the gas." Williams & Meyers, *Oil and Gas Law*, Manual of Terms.

The amount of the shut-in fee and the time required to trigger the shut-in provision varied between the FOAs. For example, the 1/14/98 FOA

7B; 1-4, p. 15, ¶ 7B; 1-5, p. 15, ¶ 7B; 1-6, p. 10-11, ¶ 7B; 1-7, p. 9, ¶ 7A; 1-8, p. 9-10, ¶ 7B; 1-9, p. 9, ¶ 7C; 1-10, p. 7, ¶ 9C; 1-11, p. 7, ¶ 9C].

With the exception of the 7/21/04 FOA which only featured a modified MOA [DE 1-10, p. 15-38], all of the FOAs attached and incorporated by reference an Agreement and Assignment of Operating Rights ("AAOR"), memorializing Magnum Hunter's right to operate wells on the lands in question and specifying that royalties must be paid to EQT on or before the 28th day of the month.[7] [DE 1-1, 1-2, p. 21-23; 1-3, p. 24-26; 1-4, p. 29-31; 1-5, p. 29-31; 1-6, p. 22-24; 1-7, p. 17-18; 1-8, p. 23-25; 1-9, p. 69-71; 1-11, p. 14-16]. Of those ten FOAs, six incorporated by reference a Model Form Operating Agreement ("MOA"), which the parties modified to include specifics about Magnum Hunter's operations.[8] [DE 1-2, p. 24-46; 1-3, p. 27-49; 1-4, p. 36-58; 1-5, p. 36-58; 1-8, p. 32-53; 1-9, p. 23-46].

---

provided that, once a well had been shut-in for 45 days, "[Magnum Hunter] shall pay unto [EQT], a Shut-in Royalty of Six Hundred Dollars ($600.00) per well per year, prorated on a monthly basis." [DE 1-2, p. 11, ¶ 7B]. By contrast, the 10/3/97 FOA imposed a shut-in royalty of only $500 per well per year, prorated on a monthly basis once the well had been shut in for 45 days or longer. [DE 1-7, p. 9, ¶ 7A].

[7] Much like the FOAs, the language of the AAORs varies slightly. While most of them simply set the above-mentioned payment deadline, a few of the AAORs provide that royalties must be paid "on or before the 28the day of the month, no later than 90 days following the month in which production is sold." [DE 1-4, p. 29; 1-9, p. 69; 1-11, p. 14-15].

[8] The parties amended some of the FOAs in writing. [*See* DE 1-15]. The amendments did not alter the provisions pertinent to this Court's analysis.

Ten of the FOAs had clauses indicating that, "[i]n the event that there exists any conflict between the terms and conditions of this Agreement and the provisions of any Exhibit attached hereto, the terms and conditions of this Agreement shall control." [DE 1-2, p. 15, ¶ 15H; 1-3, p. 17, ¶ 15G; 1-4, p. 20, ¶ 15G; 1-5, p. 20, ¶ 15G; 1-6, p. 15, ¶ 15G; 1-7, p. 17; 1-8, p. 13, ¶ 15H; 1-9, p. 12, ¶ 16F; 1-10, p. 11, ¶ 20J; 1-11, p. 11, ¶ 20J]. The 4/12/96 FOA did not contain a conflict clause. Nine of the FOAs also included the following provision:

> A failure by any party hereto to exercise any right or rights or to take any authorized action shall in no way serve to permanently amend or modify this Agreement, nor shall a departure from the terms and conditions of the Agreement establish a course of conduct of amending this Agreement. This Agreement cannot be modified except in writing. Activities of parties cannot be construed to modify the terms.

[DE 1-2, p. 15, ¶ 15I; 1-3, p. 17, ¶ 15H; 1-4, p. 20, ¶ 15G; 1-5, p. 20, ¶ 15G; 1-6, p. 15, ¶ 15H; 1-8, p. 13, ¶ 15G; 1-9, p. 12, ¶ 16G; 1-10, p. 10, ¶ 20F; 1-11, p. 10, ¶ 20F].

In December 2008, Magnum Hunter built a processing plant and began transporting gas from FOA wells to that facility, where it was converted into NGLs. [DE 52-3 at 3-5]. This endeavor was part of Magnum Hunter's effort to comply with new requirements imposed by the Federal Energy Regulatory Commission ("FERC").[9] [DE

---

[9] Under the new FERC requirements, Magnum Hunter had to lower the BTU content of gas produced from FOA wells or shut them in. [DE 52-3 at 3-

23-4, 27-2 at 15-16].  Magnum Hunter deducted transportation and processing costs from the NGL sales price, then used the difference as the basis for calculating EQT's royalty on NGLs.  [*Id.*].  EQT maintains that Magnum Hunter's executives made this decision internally, while Magnum Hunter insists that it consulted with EQT before taking post-production deductions.[10]  [*Id.*].

After receiving payments for six years, EQT realized that it was losing revenue and exercised its contractual right to audit Magnum Hunter's production records related to the FOAs.  [*Id.* at p. 5, ¶ 10-12; 1-9; 1-14].  The Audit Report, prepared by Mercadante and Company, PC, reported that Magnum Hunter had failed to pay the full amount of shut-in fees, royalties, and escalation fees due under the terms of the FOAs.  [DE 1-14].  It also indicated that Magnum Hunter had made unauthorized deductions in calculating the royalties owed to EQT.  [*Id.*].  In sum, the Report identified net exceptions totaling $2,367,307 for the audit period of 2011 to 2013.  "Net exceptions in the amount of $3,620,661 … were identified" for the audit period of 2011 to 2013.  [*Id.*].  EQT was

---

5].  BTUs, or British thermal units, denote "[t]he amount of heat needed to raise the temperature of one pound of water one degree Fahrenheit." Williams & Meyers, *Oil and Gas Law*, Manual of Terms.

[10] Although the term "production" is a "horse of many colors," the term often refers to the act of bringing oil or gas to the wellhead and severing it from the earth.  *See Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1165 (5th Cir. 1988); *see also* Williams & Meyers, *Oil and Gas Law*, Manual of Terms.  Thus, the Court will refer to the transportation and processing costs subtracted from EQT's royalties as post-production deductions.

entitled to $2,367,307 of that total. [*Id*.]. The remainder was allocated to KRCC Oil & Gas, LLC, EQT's co-Farmor in the 12/11/02 FOA. [*Id*.].

On December 15, 2015, Magnum Hunter filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware. [DE 1, p. 5, ¶ 15]. During this proceeding, "EQT asserted a claim in the amount of $5,896,907.00 for the unremitted shut-in fees, royalties, overriding royalties; underpayment for the sale of natural gas liquids; improper post-production deductions from royalties; and other amounts related to the [FOAs]." [*Id*. at p. 6, ¶ 19; DE 1-12]. In addition to the $2,367,307 allegedly owed to EQT for 2011 to 2013, EQT sought additional sums for 2002 to 2010 and 2013 to 2015 "based on production records from Magnum Hunter." [DE 1-14]. The parties ultimately agreed that Magnum Hunter would pay EQT $1,833,780 for amounts owed for natural gas between January 2011 and October 2013. [*Id*. at p. 6-7, ¶ 23-24]. Although EQT withdrew the remainder of its claims from the bankruptcy petition, it reserved the right to pursue them in a separate proceeding. [*Id*.].

Accordingly, on May 19, 2016, EQT filed the instant action against Magnum Hunter, asserting the following claims: (1) breach of contract for failure to render payment for wells in production; (2) breach of contract for failure to render shut-in royalty

7

payments; (3) breach of contract for failure to escalate royalty or overriding royalty percentages after the specified time period; (4) breach of contract for failure to escalate royalty or overriding royalty percentages after proceeds from production exceeded costs; (5) breach of contract for improper royalty and overriding royalty deductions; (6) prejudgment interest on the EQT cash payment; (7) unjust enrichment; (8) accounting; (9) declaratory relief; and (10) injunctive relief. [DE 1].

Before discovery closed, Magnum Hunter moved for partial summary judgment on the claim for unauthorized deductions relating to NGL royalties. In its Motion, Magnum Hunter argues that the FOAs did not address the production of NGLs at all and that, thus, they did not prohibit Magnum Hunter from taking post-production deductions in calculating EQT's royalty payments. In the alternative, Magnum Hunter asserts that it was not required to pay royalties to EQT because it was acting as a processor, rather than a lessee, with regard to NGLs.

Once discovery closed, the parties contacted United States Magistrate Judge Robert E. Wier, seeking assistance in resolving a discovery dispute. [DE 41]. Magnum Hunter complained that it had repeatedly asked EQT to provide evidence relating to its damages calculations but received only the Mercadante audit materials. [DE 43]. When Magnum Hunter deposed John Bergonzi,

EQT's corporate representative, he could not explain how EQT had calculated certain categories of damages that were not covered by the audit, except to say that it had "brought forward" production figures from its Enertia database. [*Id.*]. EQT had not provided this data to Magnum Hunter. [*Id.*].

Judge Wier provisionally "exclude[d] as a preclusive sanction under Rule 37(c) and (d), from further proceedings in this case any evidence on which EQT relied to make damages calculations that EQT did not produce to Magnum Hunter." [DE 43]. EQT filed a Motion for Reconsideration, which Judge Wier denied in a written Memorandum Opinion and Order on May 25, 2017. [DE 49, 54, 55, 61]. EQT then submitted Objections to Judge Wier's ruling, which this Court overruled in a separate Memorandum Opinion and Order.

Shortly thereafter, Magnum Hunter moved for summary judgment on all remaining claims, arguing that EQT could not prove its damages in light of Judge Wier's ruling. [DE 62]. EQT simultaneously moved for partial summary judgment on Count I (Breach of Contract for Failure to Render Payment for Wells in Production), "as it relates to royalty due and owing from October, 2015–present." [DE 63-1 at 3]. EQT also sought summary judgment on Count V (Breach of Contract for Improper Royalty and Overriding Royalty Deductions) and Count VI (Prejudgment Interest), "as it relates to damages for Counts I and V." [*Id.*].

According to EQT, "[t]he undisputed evidence demonstrates that [Magnum Hunter] has breached the contracts by failing to make full and complete payments for royalty." [*Id.*]. In support of this assertion, EQT notes that it has not received a payment from Magnum Hunter in two years. [*Id.*]. As for Count V, EQT reiterates arguments made in responding to Magnum Hunter's Motion for Partial Summary Judgment. [*Id.*]. Specifically, EQT insists that the FOAs address the production of NGLs and explicitly prohibit Magnum Hunter from taking any royalty deductions, apart from severance taxes. [*Id.*]. Finally, EQT argues that prejudgment interest should be awarded because it has not had the use of these sums for several years now. [*Id.*]. The Court will address each of these Motions, and the numerous arguments raised therein, in turn.

### III. ANALYSIS

#### A. Applicable Law

Federal courts sitting in diversity apply federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). The substantive law of the forum state governs the claims asserted. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439 (6th Cir. 1993). Accordingly, the Court will evaluate the Motions in accordance with the Federal Rules of Civil Procedure while applying substantive Kentucky law to the underlying claims.

10

## B.   Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law.  *Id.*

Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Id.* at 250 (quoting Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

## C.   Magnum Hunter's Partial Motion for Summary Judgment

### 1.   Interpretation of the FOAs

"A contract between parties dealing in oil and gas is subject to the same rules of construction as any ordinary contract." *Oliver v. Louisville Gas & Elec. Co.*, 732 S.W.2d 509, 511 (Ky. Ct. App. 1987). Interpretation of a contract "must begin with an examination of the plain language of the instrument." *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). "'[I]n the absence of ambiguity a written instrument will be enforced strictly according to its terms,' and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003) (quoting *O'Bryan v. Massey-Ferguson, Inc.*, 413 S.W.2d 891, 893 (Ky. 1966)). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010). In such instances, "the court's primary objective is to effectuate the intentions of the parties." *Dunaway*, 490 S.W.3d at 695 (citing *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002)).

The FOAs state that EQT is entitled to royalties based on a percentage of "8/8 of the gross proceeds received by [Magnum Hunter] from the sale of oil and/or gas, without deductions of any kind, produced from wells drilled hereunder." [*See* DE 1-1, p. 6,

¶ 4A].  This language indicates that Magnum Hunter only owes EQT royalties from the sale of NGLs if they qualify as "oil and/or gas," as that term is used in the FOAs.

Although none of the FOAs explicitly define "oil and/or gas," some of them provide more guidance as to the meaning of this term than others.  Accordingly, the Court will divide the FOAs into three subsets: (1) FOAs that define "oil well" and "gas well" and attach and incorporate an MOA defining "oil and gas"; (2) FOAs that define "oil well" and "gas well" but do not attach and incorporate an MOA defining "oil and gas"; and (3) FOAs that do not define "oil well" and "gas well" and do not attach and incorporate an MOA defining "oil and gas."  The Court will then analyze each subset in turn.

### a. FOAs that define "oil well" and "gas well" and attach and incorporate an MOA defining "oil and gas"

Nine of the FOAs include definitions for the terms "oil well" and "gas well."  [*See* DE 1-2, p. 2, ¶ 2M; 1-3; 1-4; 1-5; 1-8; 1-9; 1-10].  "Gas Well" means "gas well as defined by Kentucky Revised Statute Number 353.010," which provides as follows:

"Gas well" means any well which:

(a) Produces natural gas not associated or blended with crude petroleum oil any time during production; or

(b) Produces more than ten thousand (10,000) cubic feet of natural gas to each barrel of crude petroleum oil from the same producing horizon.

13

Ky. Rev. Stat. Ann. § 353.010(10); *see also* Ky. Rev. Stat. Ann. § 353.010(9) (defining "gas" as "natural gas"). Similarly, "Oil Well" means "any well which produces one (1) barrel or more of oil to each ten thousand (10,000) cubic feet of natural gas." Ky. Rev. Stat. Ann. § 353.010(14); *See also* Ky. Rev. Stat. Ann. § 353.010(13) (defining "oil" as "petroleum").

While the terms "oil well" and "gas well" are not synonymous with the phrase "oil and/or gas," they are closely related. After all, KRS § 353.010 defines "oil well" and "gas well" in terms of the substances produced therefrom. The FOAs also clearly state that royalties are only owed on substances produced from the subject wells. Thus, if the FOAs contemplate wells producing natural gas or petroleum, it follows that the term "oil and/or gas" also refers to natural gas or petroleum.

Seven of those FOAs attach and incorporate MOAs, which state that "Oil and Gas" means "oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated." [*See id.* at p. 27, Art. I, ¶ K]. Because the MOA definition embraces all types of substances produced as result of oil and gas exploration, while the FOAs contemplate only the production of

14

natural gas and petroleum, the Court finds that there is a conflict between the FOAs and their attached MOAs.  Accordingly, the Court must determine which document takes precedence, and thus, which definition controls the instant dispute.

EQT urges the Court to apply the broader MOA definition and find that NGLs qualify as "oil and/or gas" within the meaning of the FOAs.  However, EQT fails to explain why the MOA definition should control.  After all, these FOAs unambiguously state that, "[i]n the event that there exists any conflict between the terms and conditions of this Agreement and the provisions of any Exhibit attached hereto, the terms and conditions of this Agreement shall control."  [*See id*. at p. 15, ¶ 15H].  Thus, the Court must rely on the FOA definitions in evaluating the royalty provisions at issue.

That being the case, EQT argues that the FOA definitions originate from KRS Chapter 353, entitled Mineral Conservation and Development, which defines "gas" broadly enough to include NGLs. In support of this proposition, EQT notes that the Kentucky Natural Gas Acquisition Authority Act defines "gas" as "natural gas or any substitute for natural gas, including synthetic natural gas, liquefied natural gas, coal gas, or other substance usable in lieu of natural gas."  Ky. Rev. Stat. Ann. § 353.402(3).  Similarly, the Kentucky Gas Pipeline Authority Act defines "gas" as "natural

gas, coalbed or other methane gas, carbon dioxide gas, crude oil or petroleum products, or any elements of natural gas or other gas." Ky. Rev. Stat. Ann. § 353.750(6).

This argument fails because the FOAs do not reference KRS § 353.402(3) or KRS § 353.750(6) in defining "oil and/or gas." While EQT invites the Court to find that these broad definitions extend to KRS § 353.010, simply because they are all housed within Chapter 353, the text of the statutes themselves contradict this logic. KRS § 353.010, the very section cited in the FOAs, provides definitions for the whole chapter, "unless the context requires otherwise." By contrast, KRS § 353.402(3) and KRS § 353.750(6) apply only to their respective subchapters.

If anything, this distinction makes it clear that the definitions from KRS § 353.010 does not include the range of other substances identified in KRS § 353.402(3) and KRS § 353.750(6), as it demonstrates that the Kentucky General Assembly declined to apply the broader definitions to KRS Chapter 353 as a whole.[11] Because the FOAs unambiguously rely on KRS § 353.010 for their definition of "oil well" and "gas well," and because the relevant

---

[11] EQT briefly suggests that NGLs are automatically included within the definition of "gas" because they are composed of hydrocarbons, just like natural gas. However, this observation has not stopped legislatures, courts, or contracting parties from differentiating the two, as explained above. If the Court were to accept EQT's argument, it would render such efforts to distinguish between substances a nullity.

subsections of KRS § 353.010 speak only of natural gas, the Court finds that NGLs are not included within the phrase "oil and/or gas," as that term is used in the FOAs.[12]

### b. FOAs that define "oil well" and "gas well" but do not incorporate an MOA defining "oil and gas"

Two of the FOAs define "oil well" and "gas well" by reference to KRS § 353.010, but do not incorporate MOAs with conflicting definitions of "oil and gas." [DE 1-6; 1-11]. Absent such a conflict, the FOA definition of "gas well" as a well "[p]roducing natural gas" controls. For reasons explained in the previous section, the Court again concludes that the FOAs unambiguously limit the term "gas" to natural gas, thereby excluding NGLs.

### c. FOAs that do not define "oil well" and "gas well" and do not incorporate an MOA defining "oil and gas"

Two of the FOAs fail to define "oil well" and "gas well" at all, nor do they incorporate an MOA defining the terms "oil and gas." [DE 1-1; 1-7]. Thus, the Court must construe the term "gas" in accordance with its plain meaning. According to *Merriam-Webster's Dictionary of English Usage*, "gas" is "a fluid (such as air) that has neither independent shape nor volume but tends to

---

[12] EQT offers deposition testimony in support of their argument that the parties contemplated the inclusion of NGLs in the FOAs. It also notes that Magnum Hunter paid some royalties on NGLs at the beginning of their production, thereby suggesting that the company had a contractual obligation to do so. However, the Court need not consider such extrinsic evidence because the FOAs unambiguously adopt a limited definition of "gas well," which does not include NGLs.

expand indefinitely." By contrast, "liquids" are "neither solid nor gaseous." *See Merriam-Webster's Dictionary of English Usage*. Because NGLs are liquid in form, rather than gaseous, the Court finds that the term "gas," as it is used in these two FOAs, unambiguously excludes NGLs.[13]

### 2. Effect of Interpretation

Because the FOA definition of "gas well" does not contemplate the production of NGL from subject wells, the royalty provisions requiring Magnum Hunter to pay a percentage of the proceeds from the sale of "oil and/or gas" do not apply to NGLs. While Kentucky law allows courts to utilize the "at the well" royalty calculation when an oil and gas lease provides for royalties but does not specify the method for their calculation, the Court is not aware of any cases applying this rule to oil and gas leases that do not even contemplate the production of a particular substance. *See Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*, 636 F.3d 235, 242 (6th Cir. 2011) (making an *Erie* guess that Kentucky would adopt the "at the well" rule as its default calculation method for oil and gas royalties); *Baker v. Magnum Hunter Prods.*, 473 S.W.3d 588, 596-97 (Ky. 2015) (approving of the Sixth Circuit's analysis).

---

[13] Again, the fact that NGLs and natural gas are both composed of hydrocarbons does not necessarily lead to the conclusion that the terms can be used interchangeably. For example, the term "water" generally refers to the liquid form of $H_2O$, while "water vapor" describes $H_2O$ in a gaseous state and "ice" refers to $H_2O$ in a solid state.

Thus, the Court must conclude that the FOAs do not require Magnum Hunter to pay EQT any royalties in connection with the sale of NGLs.

The Court acknowledges the possibility that the parties attempted to orally modify the FOAs or reach a separate agreement as to the production and processing of NGLs. The former possibility provides no relief for EQT because the FOAs clearly state that conversations and conduct are insufficient to modify their terms. As for the latter scenario, the record contains deposition testimony from Donald Michael Wallen and William Barr, both former employees of Magnum Hunter's predecessor, Daugherty Petroleum, indicating that the contracting parties discussed the changes necessary to comply with the new FERC regulations and that EQT did not object to the deductions at issue.

EQT does not deny meeting with Magnum Hunter during this time, but insists that it did not know of the decision to deduct post-production costs from its royalties and did not consent to such deductions. However, EQT cannot point to any evidence in the record to support this assertion, other than Wallen's brief statement that Magnum Hunter made an "internal decision" to deduct post-production costs from EQT's royalties. EQT does not offer any testimony to demonstrate that it objected to the deductions or that it ultimately negotiated a different set of terms with Magnum

Hunter.  In short, the evidence in the record does not give rise to a genuine issue of material fact as to whether a separate oral contract, express or implied, existed between the parties, and if so, what the terms of that contract were.[14]  Thus, the Court must grant Magnum Hunter's Motion for Partial Summary Judgment on Count V, to the extent that it states a claim for breach of contract related to improper deductions from NGL royalty calculations.[15]

**D.    *Magnum Hunter's Motion for Summary Judgment***

   **1.    Counts I through V**

   "To prove a breach of contract, the complainant must establish three things: 1) existence of contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Cty. Govt. v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009).   "[C]ontingent, uncertain and speculative damages generally may not be recovered" under Kentucky law. *Curry v. Bennett*, 301 S.W.3d 502, 506 (Ky. Ct. App. 2009) (citing *Spencer*

---

[14] Magnum Hunter also contends that EQT is estopped from complaining about the calculation of the royalties because it accepted payment for six years without complaint.  [DE 28 at 3-4].  This argument is moot, in light of the Court's ruling on Magnum Hunter's Motion for Partial Summary Judgment.  Likewise, EQT's insistence that Magnum Hunter's Partial Motion for Summary Judgment is premature is now moot, as discovery has closed. [DE 27 at 19].

[15] In Count V, EQT alleges that Magnum Hunter took improper deductions from the royalty calculations between 2002 and 2015.  [DE 1, p. 12-13, ¶ 55-58].  Magnum Hunter did not produce NGLs until 2008.  [DE 52-3 at 3-5].  Thus, the Court's ruling only disposes of a portion of Count V, leaving intact a claim for improper deductions from royalties on natural gas.  {DE 1, p. 20, ¶ 101].

*v. Woods*, 282 S.W.2d 851, 852 (Ky. 1955)).  However, "where it is reasonably certain that damage has resulted, mere uncertainty as to the amount does not preclude one's right of recovery or prevent a jury decision awarding damages."  *Id.*  "[I]n instances where a litigant establishes a cause of action but has not established an entitlement to compensatory damages, nominal damages may be awarded."  *Mo-Jack Distrib., LLC v. Tamarak Snacks, LLC*, 476 S.W.3d 900, 908 (Ky. Ct. App. 2015) (citing *Stoll Oil Ref. Co. v. Pierce*, 343 S.W.2d 810, 811 (Ky. 1961)).

Magnum Hunter argues that it is entitled to summary judgment on EQT's remaining breach of contract claims because EQT cannot prove damages without the excluded Enertia data.  Judge Wier's ruling certainly makes it difficult for EQT to substantiate the amounts claimed in Count I for unpaid royalties and gaps in royalty payments from May to November 2015 because EQT calculated those amounts by "br[inging] forward" Magnum Hunter production records that had been entered into EQT's Enertia database.  [DE 72-4 at 7, 10].  EQT used the same method to calculate the amounts demanded in Count V for unauthorized deductions from royalties between 2002 to 2010 and October 2013 to April 2015.[16]  [*Id.*].  Thus, Judge

---

[16] Magnum Hunter also asserts that EQT's claim for damages dating back to 2002 is "time-barred under the contracts themselves (and certainly would also be barred by laches."  [DE 67 at 9].  Magnum Hunter does not elaborate on either of these arguments.  Although the Court could simply reject Magnum Hunter's assertions for failure to sufficiently develop them, it will make a few brief observations.  *See McPherson v. Kelsey*,

Wier's ruling also hampers EQT's ability to support the claim for damages set forth in Count V.

However, Kentucky law indicates that a plaintiff's failure to establish his or her entitlement to compensatory damages is not fatal to a claim if he or she can otherwise establish a cause of action. *Curry*, 301 S.W.3d at 506; *Mo-Jack Distrib., LLC*, 476 S.W.3d at 908. Magnum Hunter insists that *Curry* and *Mo-Jack* are distinguishable from the instant matter because they considered the plight of plaintiffs who did not have sufficient information to prove damages, whereas this case involves a plaintiff whose own mistakes impacted its ability to prove damages. Neither case suggests that such a distinction should be made, and the Court is not aware of any other case law supporting such a proposition. *Curry* and *Mo-Jack* preserve a plaintiff's ability to collect nominal damages in the event that he or she can establish that a breach

---

125 F.3d 989, 995-6 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" because "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to … put flesh on its bones").

Kentucky's statute of limitations for breach of contract claims is fifteen years. The Court is not aware of any FOA provision shortening this period. Because the alleged breaches date back to 2002, and because EQT filed suit in 2016, the Court sees no evidence that these claims are time-barred by the applicable statute of limitations.

As for Magnum Hunter's laches argument, Magnum Hunter has not shown prejudice resulting from an unreasonably delay caused by EQT. *See Plaza Condo Ass'n, Inc. v. Wellington Corp.*, 920 S.W.2d 51, 54 (Ky. 1996) (explaining that laches is "an equitable doctrine" that "serves to bar claims in circumstances where a party engages in unreasonable delay to the prejudice of others rendering it inequitable to allow that party to reverse a previous course of action").

occurred, but cannot prove damages. EQT's mistakes may have placed it in such a situation, but that does not mean that it is barred from recovering nominal damages if appropriate.

In this case, there is evidence in the record to suggest that Magnum Hunter breached the terms of the FOAs by failing to pay EQT the correct amounts owed on schedule. For example, Magnum Hunter's corporate representative, Donald Michael Wallen, testified that the company had made accounting mistakes and overcharged EQT for certain costs. [DE 63-4 at 18-21]. Even if EQT is unable to fully support its claim for damages on the aforementioned aspects of Counts I and V, it may well be entitled to nominal damages.

The Court also notes that EQT seeks recovery in Counts I and V for sums owed from 2015 to present. Wallen testified that Magnum Hunter suspended payments to EQT in 2015, in an effort to correct the aforementioned accounting errors. [DE 63-4 at 21]. Magnum Hunter then entered bankruptcy, leaving the payments in suspense. [*Id.*]. This evidence of breach suggests that EQT may be entitled to nominal damages at a minimum, for the same reasons explained above. However, the record also contains a spreadsheet prepared by Magnum Hunter, which includes revenue data from 2015 to present. [DE 54-23; 63-12]. This evidence is not subject to Judge Wier's preclusive sanction and, thus, may be used to support the relevant portions of Counts I and V. Because there is a genuine issue of

23

material fact as to whether and to what extent EQT suffered damages flowing from the alleged breaches set forth in Counts I and V, summary judgment on these claims is not warranted.[17]

The Mercadante audit substantiated EQT's demand in Counts II, III and IV for omitted escalation and shut-in fees from 2011 to 2013, as well as its claim in Count V for improper deductions from royalty payments between 2011 and 2013. However, Magnum Hunter insists that the Confirmation Order entered by the bankruptcy court precludes EQT from seeking any additional sums from the 2011 to 2013 period. Thus, it concludes that these claims must be dismissed because they cannot prove any additional entitlement to damages.

By contrast, EQT maintains that it may seek to recover the difference between the amount stated in its Proof of Claim and the amount paid by Magnum Hunter during the bankruptcy proceedings. Because the Proof of Claim included a demand for over $2 million relating to the 2011 to 2013 period alone, and because Magnum Hunter only paid EQT $1,833,780, EQT's reading necessarily allows it to seek relief for additional sums relating to the 2011 to 2013 period.

---

[17] In fact, as the Court will explain *infra*, summary judgment is actually warranted in EQT's favor on a small portion of Count I.

"Interpreting court orders differs from that of statutes and contracts only to the extent that instead of construing the intent of the legislature or the intent of the parties, we must determine the intent of the ordering court." *Crouch v. Crouch*, 201 S.W.3d 463, 465 (Ky. 2006); *see also In re Settlement Facility Dow Corning Trust*, 628 F.3d 769, 772 (6th Cir. 2010) (using the same principles to interpret the terms of a joint reorganization plan from a bankruptcy proceeding). This means that "[w]here the language of the order is clear and ambiguous, we will construe the order according to its plain terms." *Crouch*, 201 S.W.3d at 465. "However, where the order is ambiguous and open to interpretation, we will endeavor to construe and effectuate the intent of the trial court." *Id.* at 465–66.

The Confirmation Order states, in pertinent part:

> Notwithstanding anything to the contrary in the Plan or this Confirmation Order, EQT, the Debtors and the Reorganized Debtors, and their successors and assigns agree that (a) the EQT Farmout Agreements are preserved in their entirety pursuant to Article IV.T of the Plan and (b) the EQT Claim shall be treated and resolved as follows: (i) on account of amounts owed for natural gas under the EQT Farmout Agreements for the period of January, 2011 through October, 2013 the Debtors shall pay EQT $1,833,780 (the "EQT Cash Payment") on or as soon as reasonably practicable following the Effective Date, but in no event later than 14 days following the Effective Date, in full and final satisfaction of and solely to the extent of the EQT Cash Payment portion of the EQT claim; (ii) the remainder of the EQT Claim (the total EQT Claim less the EQT Cash Payment (the "Remaining EQT Claim") and any and all additional claims, interests, rights, causes of action, and/or defenses,

whether contractual, monetary, equitable, or otherwise, held, alleged, and/or owned by EQT, including but not limited to all Royalty and Working Interests against any of the Debtors shall be and hereby are fully preserved in their entirety against the Reorganized Debtors and their successors and assigns, and shall be wholly unaffected, except as provided herein, by these Chapter 11 Cases, the Plan, including any and all waivers and releases contained in the Plan, and the discharge of Claims or Interests obtained by or granted to the Debtors in these Chapter 11 Cases; and (iii) subject to the foregoing preservation provision, the Remaining EQT Claim shall be and hereby is deemed withdrawn, expunged, and null and void with respect to the Chapter 11 Cases only (and not with respect to any preserved rights set forth above) and EQT shall not be entitled to any distribution in the Chapter 11 Cases.

[DE 1-13 at 60-61].

The language of this Order unambiguously preserves EQT's right to seek recovery for the remainder of the amount listed in the Proof of Claim, which necessarily includes some of the amount initially claimed in connection with the 2011 to 2013 period. After all, the bankruptcy court defined the "Remaining EQT Claim" as the total amount stated in the Proof of Claim minus the EQT Cash Payment, then stated that the Remaining EQT Claim was "fully preserved." [*Id.*]. While the Order states that Magnum Hunter made the $1,833,780 payment "on account of amounts owed *for natural gas* under the EQT Farmout Agreements for the period of January, 2011 through October, 2013," there is no indication that this amount covers other sums claimed for the 2011 to 2013 period, such as shut-in fees and operating charges related to the production of natural gas. [*Id.*]. Accordingly, the Court rejects Magnum

26

Hunter's argument that EQT cannot prove any further entitlement to damages in Counts II, III, and IV. Because the Order does not preclude EQT from seeking recovery for the Remaining EQT Claim, it is permitted to use the Mercadante audit report to prove damages, just as Magnum Hunter is entitled to use its expert to rebut the claim for damages. [DE 72-1].

Finally, EQT seeks to recover unpaid shut-in and escalation fees from 2013 to 2015 in Counts II, III, and IV. Because the Mercadante audit report only covered 2011 to 2013, EQT contacted the accounting firm and asked for advice regarding damages calculations for the 2013 to 2015 period. [DE 71-4 at 19-21]. According to John Bergonzi, Mercadante suggested that EQT use the 2011 to 2013 audit figures as an estimate for the 2013 to 2015 period. [*Id.*]. Magnum Hunter argues that these numbers are simply "placeholders," making them insufficient to support claims for damages. However, these numbers were not randomly selected. It is logical that the amount of fees and royalties owed on the FOA wells for the 2011 to 2013 period would be close to the amounts owed on the same wells for the subsequent two-year period. Magnum Hunter is free to rebut this damages calculation with its own expert, as explained above. Accordingly, the Court finds that there is a genuine issue of material fact as to whether and to what extent EQT suffered damages flowing from the alleged breaches

set forth in Counts II, III.   Summary judgment is therefore inappropriate on these claims.

### 2.   Counts VI through X

Magnum Hunter also moves for summary judgment on Counts VI through X, which state claims for prejudgment interest, unjust enrichment, accounting, declaratory relief, and injunctive relief. First, Magnum Hunter briefly contends that it is entitled to such relief on EQT's claim for unjust enrichment because it is premised on the same facts underlying the breach of contract claims.

An unjust enrichment claim consists of three elements: "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009); *see also Javier Steel Corp. v. Cent. Bridge Co.*, 353 S.W.3d 356, 359 (Ky. Ct. App. 2011).   "The claim for unjust enrichment is a legal fiction created to permit recovery where equity says there should be recovery, although there is no recovery in contract." *Holley Performance Prods., Inc. v. Keystone Auto. Operations, Inc.*, Civ. A. No. 1:09-cv-00053-TBR, 2009 WL 3613735, at *5 (W.D. Ky. Oct. 29, 2009) (citing *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. Ct. App. 1987)).

28

Although Federal Rule of Civil Procedure 8(d)(3) allows parties to "state as many separate claims or defenses as it has, regardless of consistency," federal courts within the Sixth Circuit have dismissed unjust enrichment claims that were premised on the same facts underlying a breach of contract claim, relying on the Kentucky rule that "'[t]he doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed.'" *See, e.g., Poynter v. Ocwen Loan Servicing, LLC*, Civ. A. No. 3:13-cv-773-DJH-CHL, 2016 WL 5380926, at *6 (W.D. Ky. Sept. 23, 2016) (quoting *Codell Constr. Co. v. Kentucky*, 566 S.W.2d 161, 165 (Ky. Ct. App. 1977)).

In this case, EQT has failed to plead separate claims. Its unjust enrichment claim is predicated solely on alleged breaches of the FOAs, making it duplicative of EQT's breach of contract claims. Thus, even if the Federal Rules of Civil Procedure permit alternative pleading, dismissal would still be appropriate because EQT has not successfully plead claims in the alternative. It has simply repackaged Counts I through V in Count VII. Summary judgment is therefore warranted on this claim.

Magnum Hunter then insists that summary judgment on Counts VI, VIII, IX, and X is appropriate because they simply request specific remedies for the breaches of contract set forth in Counts I through V, as well as the unjust enrichment plead in Count VII.

While Magnum Hunter is correct in asserting that prejudgment interest, accounting, declaratory relief, and injunctive relief are "remed[ies] for the wrongdoings alleged above, not [] separate, actionable claim[s]," their argument proceeds on incorrect assumption that they are entitled to summary judgment on the underlying claims. *Sparks v. Countrywide Home Loans*, Civ. A. No. 5:15-cv-99-JMH, 2015 WL 6556542, at *15 (E.D. Ky. Oct. 1, 2015) (explaining that). In short, Magnum Hunter contends that it is entitled to summary judgment on Counts VI, VIII, IX, and X because they cannot survive without Counts I through V and VII. This logic holds true, to the extent that these requested remedies pertain to the unjust enrichment claim. However, to the extent that the Court has denied summary judgment on Counts I through V, it follows that summary judgment is inappropriate on Counts VI, VIII, IX, and X.

However, Magnum Hunter makes an additional argument for summary judgment on EQT's claim for an accounting in Count VIII. "An accounting is a detailed statement of the debits and credits between parties arising out of a contract or a fiduciary relation." *Holley Perf. Prods. V. Keystone Auto. Operations, Inc.*, No. 1:09-CV-53-TBR, 2009 WL 3613735, at *3 (W.D. Ky. Oct. 28, 2009) (internal quotations omitted). "[A]s an equitable remedy, an accounting requires insufficiency of legal remedies." *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, Civ. A.

No. 5:11-cv-374-DCR, 2014 WL 2113096, at *17 (E.D. Ky. May 20, 2014) (citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962)). The plaintiff has the burden of proving that legal remedies are inadequate because "the parties are of such a complicated nature that only a court of equity can satisfactorily unravel them." *Id.* (quoting *Dairy Queen*, 369 U.S. at 478).

EQT seeks an accounting of the following items: (1) all the deductions assessed against EQT's royalties; (2) the actual volumes of Oil and/or Gas produced under the Farmout Agreements; (3) the actual prices at which MHP sold the Oil and/or Gas produced under the Farmout Agreements; and (4) the actual market price when MHP sold the Oil and/or Gas produced under the Farmout Agreements." [DE 63-1 at 20-21]. In support of this request for an accounting, EQT simply states that, "[w]ithout a complete accounting of the records and underlying data related to MHP's oil and gas production, EQT is incapable of calculating the amount that MHP owes pursuant to the Farmout Agreements." [*Id.*].

As Magnum Hunter is quick to point out, these conclusory statements do not explain why legal remedies are insufficient and, thus, fail to justify the "extraordinary remedy" of an accounting. *Bradshaw v. Thompson*, 454 F.2d 75, 79 (6th Cir. 1972); *see also Dairy Queen*, 369 U.S. at 473-74 (explaining that the burden "is considerably increased and it will indeed be a rare case in which

31

it can be met"); *City of Owensboro v. Ky. Util. Co.*, Civ. A. No. 4:04-CV-87-M, 2008 WL 4642435, at *1 (W.D. Ky. Oct. 15, 2008) ("Based on this holding, courts and commentators have indicated that, at least in the federal courts, one may now conclude that the remedy of an accounting no longer exists in cases of complex accounts.") (internal quotations and alterations omitted). Accordingly, Magnum Hunter is entitled to summary judgment on Count VIII.

**E.   EQT's Motion for Partial Summary Judgment**

As discussed above, a plaintiff must establish three things to prove a breach of contract: 1) the existence of contract; 2) breach of that contract; and 3) damages flowing from the breach of contract." *Abma*, 326 S.W.3d at 8.  EQT claims that it is entitled to partial summary judgment on its claim for unpaid royalties from 2015 to present in Count I, as well as its claim for improper deductions from NGL royalties in Count V, because it has proven that Magnum Hunter breached the terms of the FOAs.  EQT also moves the Court to grant partial summary judgment on its claim for prejudgment interest in Count VI, as it relates to Counts I and V.

According to EQT, it can prove that Magnum Hunter breached the terms of the FOAs by failing to pay royalties on natural gas from 2015 to present.  To support this proposition, EQT relies on an affidavit from John Bergonzi, its own corporate representative.

[DE 63-7].   It also points to the testimony of Magnum Hunter's corporate representative, Donald Michael Wallen, who stated that payments to EQT were placed in suspense so that Magnum Hunter could correct the incorrect royalty calculations.   [DE 63-4].   Magnum Hunter subsequently filed for bankruptcy, and EQT's payments remain suspended to this day.   [*Id.*].   Finally, EQT supports its claim with a spreadsheet, prepared by Magnum Hunter at EQT's request, which includes production records from 2015 to present. [DE 63-12].

The bulk of Magnum Hunter's argument focuses on the admissibility of the Bergonzi affidavit.   However, even if the Court disregarded that affidavit, the record would still include unrefuted testimony that Magnum Hunter suspended payments to EQT, resulting in a cessation of payments required by the FOAs.   Magnum Hunter states that "[t]his issue is very much contested in any event because EQT also owes Magnum Hunter for its share of costs in Joint Interest Billings on wells in which EQT has a working interest."   [DE 67 at 12].   It then concludes that "[e]ven if Magnum Hunter were not entitled to summary judgment, the parties could not determine whether EQT owes Magnum Hunter more in setoff than Magnum Hunter might owe in royalty until the NGL issue is determined."   [*Id.*].

Although Wallen briefly refers to an error with Joint Interest Billing in his deposition, his testimony does not actually indicate that EQT owes any sums to Magnum Hunter, let alone that those sums exceed the amount sought by EQT in this action. [DE 63-4]. Thus, the only possible basis for offset would be Magnum Hunter's payment of NGL royalties to EQT, as Magnum Hunter was not contractually required to pay EQT those sums. Nevertheless, EQT has proven that Magnum Hunter breached the FOAs in the manner described above and that EQT suffered damages as a result. Thus, partial summary judgment is appropriate on Count I, as it pertains to sums owed from 2015 to present. The Court acknowledges that this sum may be subject to offset based on the NGL royalties, but, without knowing the amount of those royalties, it must reserve that determination for a later date.

EQT also maintains that it is entitled to partial summary judgment on Count V, as it relates to the alleged improper deductions from NGL royalties. This effort fails because the Court has already found that the FOAs did not contemplate the production of NGLs or provide for the calculation of NGL royalties. Thus, Magnum Hunter did not breach the terms of the FOAs by deducting post-production costs from royalties paid to EQT. Partial summary judgment is therefore inappropriate on this portion of Count V.

EQT next seeks partial summary judgment on Count VI, at least as the demand for prejudgment interest pertains to the aforementioned portions of Counts I and V. "In a diversity case, state law governs the district court's decision whether to award prejudgment interest." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 633 (6th Cir. 2000). "The longstanding rule in [Kentucky] is that prejudgment interest is awarded as a matter of right on a liquidated demand, and is a matter within the discretion of the trial court or jury on unliquidated demands." *3D Enter. Contracting Corp. v. Louisville and Jefferson Cty. Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005) (citing *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991)). "Liquidated claims are of such a nature that the amount is capable of ascertainment by mere computation, can be established with reasonable certainty, can be ascertained in accordance with fixed rules of evidence and known standards of value, or can be determined by reference to well-established market values." *Id.* (internal quotations omitted); *3D Enter.*, 172 S.W.3d at 450 (directing courts to "look at the nature of the underlying claim, not the final award").

"Absent a contractually agreed upon rate, the appropriate rate of interest is governed by statute." *Reliable Mech., Inc. v. Naylor Indus. Servs.,* Inc., 125 S.W.3d 856, 857 (Ky. Ct. App. 2003) (citing Ky. Rev. Stat. Ann. § 360.010(1) (providing that "the legal

35

rate of interest is eight percent (8%) per annum")).  "While pre-judgment interest has traditionally been simple interest, case law does not indicate that it is required to be so." *Id.* at 858. Principles of equity may also justify an award of compound prejudgment interest under certain circumstances. *Id.* (explaining that compound interest "is an equitable means of recognizing the economic reality that [the defendant] has enjoyed a long opportunity to earn interest on the money that it wrongfully withheld from [the plaintiff]").

EQT's claim for unpaid royalties from 2015 to present are liquidated because they are capable of ascertainment by mere computation, based on the percentages set forth in the FOA royalty provisions and the gross proceeds from the sale of oil and/or gas produced from FOA wells.  In fact, it seems that Magnum Hunter has already done the necessary computations at EQT's request.  Because these damages are liquidated, EQT is entitled to prejudgment interest as a matter of right under Kentucky law.  EQT does not request that the Court apply a particular interest rate.  In the absence of any FOA provisions deviating from the statutory rate, the Court will award prejudgment interest at 8% per annum.  While EQT asks the Court to compound that interest in recognition of the fact that Magnum Hunter has had the opportunity to use the sums that it withheld from EQT, the Court is not convinced that such

measures are necessary, especially since EQT may well have had the use of funds belonging to Magnum Hunter in the years leading up to this litigation.[18]

### IV.   CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)   Defendant Magnum Hunter Production Company's Motion for Partial Summary Judgment [DE 23] be, and is, hereby **GRANTED**;

(2)   Defendant Magnum Hunter's Motion for Summary Judgment [DE 62] be, and is, hereby **GRANTED** as to the claim for unjust enrichment in Count VII, the requests in Counts VI, VIII, IX, and X for prejudgment interest, declaratory relief, and injunctive relief arising from the unjust enrichment claim, and the request for an accounting in Count VII as it pertains to all substantive counts and **DENIED** as to Counts I through V and the corresponding requests for prejudgment interest, declaratory relief, and injunctive relief set forth in Counts VI, VIII, IX, and X; and

(3)   Plaintiff EQT Production Company's Motion for Partial Summary Judgment [DE 63] be, and is, hereby **GRANTED** as to the claim

---

[18] In its Motion for Partial Summary Judgment, EQT included a request for oral argument.  The Court concluded that such a hearing was unnecessary, given the thorough briefing on these issues.

for breach of contract from 2015 to present set forth in Count I, as well as the corresponding request for prejudgment interest in Count VI, and **DENIED** as to the claim for unauthorized deductions on NGL royalties in Count V and the corresponding request for prejudgment interest in Count VI.

This the 19th day of July, 2017.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge