UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

| | |
|---|---|
| EQT PRODUCTION COMPANY, | ) |
| Plaintiff, | ) Action No. 5:16-cv-150-JMH |
| v. | ) |
| | ) **MEMORANDUM OPINION** |
| MAGNUM HUNTER PRODUCTION COMPANY, | ) **& ORDER** |
| Defendant. | ) |

\*\*\*\*

If nothing else, EQT Production Company ("EQT") embodies persistence. If at first EQT does not succeed, it tries again. On numerous issues at trial, EQT did not succeed. Now after trial, EQT wants to try again. Such persistence is often laudable. And the Court appreciates the zealous advocacy in this case. But at some point, the time for second chances is over. And here EQT's request for a new trial or altered judgment [DE 125] consists merely of arguments already rejected by this Court. EQT expects a different result, but it will not get one. The decisions of the Court stand, and EQT's motion is **DENIED**.

I.

The Court has laid out the factual and procedural background of this case in multiple prior orders. A truncated version suffices for the present Motion.

EQT and Magnum Hunter long enjoyed a working relationship in the oil and gas business. Under eleven Farmout Agreements ("FOAs"), Magnum Hunter drilled wells on property owned or leased by EQT and sold oil and/or gas from those wells. [DE 1; DE 117, p. 9]. In exchange, EQT received a royalty, amounting to a percentage of 8/8ths of the gross proceeds received from the sale of oil and/or gas produced from wells drilled thereunder without deductions of any kind. [Pl.'s Trial Exs. 1-11]. For a while, it worked. But over time, as the oil and gas market dried up, EQT and Magnum Hunter came to disagreements regarding certain rights, responsibilities, and payments under the agreements. So in September 2013, EQT exercised its audit rights under the contracts. The audit, conducted by Mercadante & Company, P.C. ("Mercadante"), contained specific written "exceptions" that indicated Magnum Hunter owed EQT for unpaid shut-in fees, royalties and/or overriding royalties, and escalation fees. [DE 77, p. 6; DE 118, pp. 4-5; DE 122, p. 4; Pl.'s Trial Ex. 14]. The audit identified net exceptions of $2,367,307 for the 2011-2013 period. [Pl.'s Trial Ex. 14; Def.'s Trial Ex. 176]. After the audit, the parties agreed to adjust the amount of the audit findings to $1,833,780. [Def.'s Trial Ex. 50; Def.'s Trial Ex. 176]. The amount excluded $607,216 related to Natural Gas Liquids ("NGLs") that had been included in the audit. [DE 119-1, p. 7; DE 120-3, p. 26; Def.'s Trial Ex. 50; Def.'s Trial Ex. 176]. The parties continued to

dispute whether Magnum Hunter owed additional amounts related to NGLs, but otherwise EQT and Magnum Hunter agreed to the $1,833,780 amount for the audit period.

After the audit, in December 2015, Magnum Hunter entered bankruptcy. [DE 117, p. 30]. EQT filed a Proof of Claim for $5,896,907. [Pl.'s Trial Ex. 12]. This included the full audit amount of more than $2 million, despite the parties' agreement on $1,833,780. [*Id.*]. The Proof of Claim also included amounts from 2002-2010 and amounts from the post-audit period. [*Id.*]. EQT used the audit numbers as a baseline and extrapolated to determine some of the new amounts it sought to recover.

Once Magnum Hunter came out of bankruptcy, it made the $1.8 million cash payment to EQT that the parties previously agreed to. [DE 122, pp. 6-7]. The payment did not include any amount for NGLs or any claims for 2002-2010 or post-audit periods. Despite Magnum Hunter's payment, EQT filed this lawsuit seeking the entire amount—nearly $5.9 million—listed in its proof of claim. [DE 1, p. 5]. In particular, EQT alleged Magnum Hunter took deductions against oil and gas royalties in violation of the FOAs. [DE 1]. EQT also contended Magnum Hunter failed to pay certain shut-in fees, and the parties continued to disagree over what amount, if any, Magnum Hunter owed EQT for NGL royalties. [*Id.*].

Before trial, the Court issued several orders relevant to the present motion. First, the Court settled the NGL question in its July 2017 Memorandum Opinion and Order. [DE 77]. There, the Court granted Magnum Hunter summary judgment on the NGL question and ruled that NGLs were not "oil and/or gas" under the FOAs. [DE 77, p. 37]. EQT asked the Court to reconsider, but the Court declined the invitation. [DE 93; DE 98].

Second, after a discovery dispute, Magistrate Judge Wier issued a provisional ruling that limited EQT's damages proof to "the current universe of produced discovery and preclude[d] EQT from offering evidence to calculate damages that it ha[d] not yet produced to Magnum." [DE 43, p. 2]. Judge Wier then denied EQT's Motion for Reconsideration and froze EQT's damages-related proof to "where it happily stood at the time of the Bergonzi deposition." [DE 63, p. 17]. The rulings stemmed from EQT's failure to turn over internal records, known as "Enertia," that EQT used to calculate its damages. EQT never provided the records to Magnum Hunter prior to Magnum Hunter's deposition of John Bergonzi, EQT's witness. EQT filed objections to Judge Wier's Order, but this Court overruled those objections. [DE 78].

The parties tried the case to the bench September 5-6, 2017 in Lexington, Kentucky. [DE 117; DE 118]. At trial, the Court admitted Plaintiff's Exhibit 52 by avowal. [DE 117, p. 18]. The

4

Court found that the exhibit—which allegedly showed that Magnum Hunter made improper deductions on EQT's royalties from before 2010—was precluded by the Court's prior discovery orders freezing EQT's proof. [DE 117, p. 18].

At the close of evidence, the parties submitted proposed findings of fact and conclusions of law and a memorandum of law in lieu of closing arguments. [DE 119; DE 120; DE 121]. At trial and in post-trial filings, EQT made the same arguments it makes in the present motion. The Court issued its Findings of Fact and Conclusions of Law in December and found (1) Magnum Hunter breached the FOAs by failing to make timely royalty payments under Count I; (2) Magnum Hunter breached the FOAs by failing to pay shut-in fees from 2013 to present under Count II; and (3) EQT failed to prove that Magnum Hunter made improper deductions under Count V, largely because EQT could not produce admissible damages-related proof. [DE 122, pp. 33-34]. The Court also denied EQT's request for declaratory relief. [*Id.* at p. 34].

After the Court issued its Judgment, EQT filed the present Motion under Rule 59 for a new trial and for an altered or amended judgment, and under Rule 52(b) for amended findings. [DE 124]. Magnum Hunter filed its response [DE 125] to which EQT replied [DE 127], making the matter ripe for review.

II.

"When a district court enters a judgment, the Federal Rules give the losing party several types of recourse: The party may ask the court to amend its findings or make additional findings, *see* Fed R. Civ. P. 52(b); it may seek a new trial, *see* Fed R. Civ. P. 59(a); it may seek to alter or amend the judgment, *see* Fed. R. Civ. P. 59(e)." *Gencorp Inc. v. Olin Corp.*, 477 F.3d 368, 372 (6th Cir. 2007). A Rule 52(b) motion to amend the Court's findings of fact or make additional findings may "accompany a motion for a new trial under Rule 59." Fed. R. Civ. P. 52(b). Although the rules supply litigants several post-judgment options, "[t]he 'public policy favoring finality of judgments' limits the availability of relief." *Gencorp*, 477 F.3d at 372 (quoting *Waifersong Ltd., Inc. v. Classic Music Vending*, 976 F.2d 290, 292 (6th Cir. 1992)).

"A Rule 59 motion should only be granted if there was (1) clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Michigan Flyer, LLC v. Wayne Cty. Airport Auth.*, 860 F.3d 425, 431 (6th Cir. 2017) (quoting *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010)). "The purpose of Rule 59(e) is 'to allow the district court to correct its own errors, sparing the parties and appellate courts the burden of unnecessary appellate proceedings.'" *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008) (quoting *York*

*v. Tate*, 858 F.2d 322, 326 (6th Cir. 1988)). But the Sixth Circuit has repeatedly held that a "'motion under Rule 59(e) is not an opportunity to re-argue a case.'" *Michigan Flyer*, 860 F.3d at 431 (quoting *Sault Ste. Marine Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998)). And a party may not use the Rule "to relitigate old matters." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486, n.5 (2008). Indeed, these motions are "'seldom granted' because relief 'contradicts notions of finality and repose.'" *Zell v. Klingelhafer*, No. 13-cv-458, 2018 WL 334386, at *4 (S.D. Ohio Jan. 8, 2018) (quoting *Coleman v. United States*, No. 2:05-CR-0043(1), 2017 WL 2266881, at *2 (S.D. Ohio May 23, 2017)); *see also Day v. Krystal Co.*, 241 F.R.D. 474, 476 (E.D. Tenn. 2007). "If . . . a Rule 59 motion merely quibbles with the Court's decision, the proper recourse is not a motion for reconsideration but instead an appeal to the Sixth Circuit." *Zell*, 2018 WL334386, at *4. The Rule is not "a substitute for appeal." *Turner v. City of Toledo*, 671 F. Supp. 2d 967, 969 (N.D. Ohio 2009). Mere disagreement with the Court's decision is not enough.

When parties try their claims to the bench, the Court may grant a new trial under Rule 59 "where it concludes that it has made a 'manifest error of law or mistake of fact' and that 'substantial reasons' exist for setting aside the judgment." *TGC Corp. v. HTM Sports, B.V.*, 896 F. Supp. 751, 754 (E.D. Tenn. 1995)

(quoting *Hager v. Paul Revere Life Ins. Co.*, 489 F. Supp. 317, 321 (E.D. Tenn. 1977)).

Like Rule 59, Rule 52(b) allows courts to alter and amend the judgment. Fed. R. Civ. P. 52(b). Also like Rule 59, Rule 52 "is 'not intended to allow parties to rehash old arguments already considered and rejected by the trial court.'" *Zell*, 2018 WL 334386, at *3 (quoting *Nat'l Metal Finishing Co. v. BarclaysAmerican / Commercial, Inc.*, 899 F.2d 119, 123 (1st Cir. 1990)). In addition, Rule 52(b) allows the court to amend its findings or make additional findings. But "a party who failed to prove his strongest case is not entitled to a second opportunity to litigate a point" under Rule 52(b). 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2582 (3d ed. 2017).

### III.

EQT argues the Court made four errors that require an amended judgment or new trial: the Court (1) erred in finding that EQT did not prove damages for its breach of contract claim under Count V; (2) improperly found that Magnum Hunter did not breach the FOAs by netting costs related to NGLs against oil and gas royalty payments; (3) should have granted EQT a declaratory judgment; and (4) failed to award EQT certain prejudgment interest.

As an initial matter, the Court recognizes that EQT simply repackages arguments the Court has already considered at trial and in post-trial filings. And because Rule 59 is "not an opportunity to re-argue a case," the Court could simply deny EQT's motion. *Michigan Flyer*, 860 F.3d at 431. But the Court finds it appropriate to further explain why EQT's arguments are without merit.

### A. EQT's Failure to Prove Damages

EQT's ability to prove damages under Count V hinges on the admissibility of Plaintiff's Exhibit 52. This document purportedly shows improper deductions Magnum Hunter took against EQT's gas royalty before 2010. At trial, the Court admitted this document by avowal. [DE 117, p. 18]. The Court reasoned that earlier discovery orders precluded EQT from proffering this damages-related proof. [DE 117; 122, pp. 20-22].

Those orders established that EQT could not introduce damages-related proof that it did not produce to Magnum Hunter as of the date of the Bergonzi deposition. The Court made the discovery rulings because EQT did not provide any damages calculation to Magnum Hunter when it sought to depose Bergonzi, effectively depriving Magnum Hunter of a full opportunity to investigate EQT's claims. EQT argued then, as it does now, that the raw data initially came from Magnum Hunter, and thus Magnum

9

Hunter could not be prejudiced. The Court saw it differently. Despite the fact that information "may well have (and apparently did) originally come from MHP," Magnum Hunter "was not aware of how EQT had processed the information, how Enertia treated, computed, or utilized it, how EQT used it to calculate damages, and the like." [DE 61, p. 9]. "Without such information, Magnum Hunter was unable to fully and meaningfully question John Bergonzi." [DE 78, p. 6]. Therefore, the Court ruled, EQT "should not be permitted to use in any proceeding damages proof it had not supplied as of the Bergnozi deposition." [DE 61, p. 17]. Indeed, the Court was explicit: "*any evidence* on which EQT relied to make a damages calculation that EQT did not produce" to Magnum Hunter was excluded. [DE 61, pp. 4-5] (emphasis added). The Order "h[e]ld EQT to what EQT . . . produced." [*Id*. at p. 5].

Based on these pretrial rulings, the Court admitted Exhibit 52 only by avowal. EQT argues that Exhibit 52 does not fall under the Court's prior discovery orders because Magnum Hunter produced the document, not EQT. [DE 124-1, p. 9]. After all, EQT argues, the data in Exhibit 52 was always in Magnum Hunter's hands and, as EQT puts it, the exhibit "cannot possibly fall under the Court's discovery ruling, as EQT could not have produced it to Magnum Hunter prior to Bergonzi's deposition." [*Id*. at p. 10].

10

In the first place, it is *the Court*, and not EQT, who is in the best position to understand the scope of its *own orders*. In its Motion, EQT argues Exhibit 52 "cannot" fall under the Court's prior orders, but the Court disagrees and finds this is precisely the type of proof EQT was barred from introducing.

EQT contends that under *Howe v. City of Akron*, 801 F.3d 718 (6th Cir. 2015), the Court should admit Exhibit 52 because the information came from Magnum Hunter. [DE 125]. Judge Wier analyzed the *Howe* factors in his initial opinion, and this Court considered EQT's argument in its Findings of Fact and Conclusions of law. [DE 61; DE 122]. In *Howe*, the defendant had all relevant information in its possession and the defendant "*knew* that Plaintiffs intended to use . . . simple math . . . to calculate" damages. 801 F.3d at 748. (emphasis added). The Court held that district courts should not exclude evidence when "the defendant 'had all the information relevant to the computation of damages *in its possession*' and 'had a *full opportunity* during [the plaintiff's] deposition to question him about damages.'" *Id*. (emphasis added). That is not the case here where Magnum Hunter, at the time of the Bergonzi deposition, did not have a full opportunity to question Bergonzi about EQT's damages calculations. Magnum Hunter could not do so because EQT *never disclosed* where the damages calculations came from. Without that information, Magnum Hunter did not have a full opportunity to depose Bergonzi.

11

True, as EQT argues, the information contained in Exhibit 52 came from Magnum Hunter, but so too did the data entered into Enertia. And more to the point, the source of the document does not, by itself, compel admission. The Court instead based its pre-trial orders on EQT's failure to explain damages, which prevented Magnum Hunter from having any meaningful deposition of Bergonzi. After all, even though Exhibit 52 came directly from Magnum Hunter, Magnum Hunter did not know at the time of the Bergonzi deposition that EQT was using information in Exhibit 52 as its basis for damages calculations. Indeed, Magnum Hunter could not have known what EQT used to come up with its damages numbers. Thus, Magnum Hunter could not question Bergonzi about EQT's method to calculate damages and was deprived a full opportunity to depose Bergonzi on this issue.

EQT disputes this point arguing "[n]o basis exists for finding that Magnum Hunter did not have a full opportunity to question EQT regarding the information contained in Plaintiff's Exhibit 52." [DE 124, p. 11]. But EQT does not tell us why "no basis exists." The Court finds no merit to the argument. The basis is simple: when Bergonzi came to testify at his deposition, EQT had not provided information regarding how it came up with damages for these claims; thus, Magnum Hunter had no opportunity to fully and meaningfully question Bergonzi about those calculations. Without

12

knowing where EQT's numbers came from, Magnum Hunter could not question Bergonzi about the numbers.

EQT also argues that the Court must admit the exhibit because EQT did not have possession of the document at the time of the Bergonzi deposition and thus EQT could not have produced it to Magnum Hunter. Indeed, EQT argues it "could not have produced *the information*" in Exhibit 52 "prior to Mr. Bergonzi's deposition because it was created" by Magnum Hunter. [*Id*.]. (emphasis added). This again illustrates EQT's failure to fully grasp the Court's orders. The Court *froze* EQT's proof to what it had offered at the time of the Bergonzi deposition because EQT failed to turn over Enertia data. As such, the Court precluded EQT from offering *any* additional damages proof, regardless of whether EQT had the information at the time of the Bergonzi deposition or not. The Court did not provide an exception for things not yet produced or created. The Court froze EQT's proof because it had not turned over information it should have. EQT will not be permitted to circumvent these rulings by introducing new documents it did not have prior to the Bergonzi deposition.

The Court also remains puzzled by EQT's argument that it could not have turned over the data in Exhibit 52. On the one hand, EQT argues that Exhibit 52 proves its damages under Count V for pre-2010 claims. On the other hand, EQT argues that it could not have

13

produced "*the information*" in Exhibit 52 until Magnum Hunter provided the document only days before trial. As Judge Wier previously wrote, "EQT, as the Plaintiff, the master of its claim, and the party making its own damages calculation, should have been well aware, early in the case, of the basis for [the damages] calculation." [DE 61, p. 14]. If, as EQT argues, EQT could not have produced the *information* that purportedly proves its damages until days before trial, then how did EQT calculate its damages? Exhibit 52 cannot both prove EQT's damages and also be information that EQT did not have access to during discovery. EQT likely did not have Exhibit 52 itself, but EQT certainly had access to the *information* within the document, since, by EQT's argument, the Exhibit proves damages.

The Court also rejects EQT's argument that "[n]o discernible differences exist between Plaintiff's Trial Exhibit 52 and Defendant's Trial Exhibit 177 that would compel admission of one but not the other." [DE 124, p. 12]. As EQT notes, the Court admitted Exhibit 177. But fundamental differences exist between Exhibits 52 and 177. First, Exhibit 52 was *plaintiff's* exhibit, while 177 was *defendant's* exhibit. The Court's prior discovery orders froze only *EQT's* proof, not proof generally. Thus, while EQT could no longer produce additional proof, nothing in prior discovery orders barred Magnum Hunter from introducing such an exhibit. Second, Exhibit 177 was admitted *without objection*. In

14

fact, both parties relied on this Exhibit. Exhibit 52 was the center of a long dispute before trial, during trial, in post-trial filings, and in the present motion. Far from "no discernible differences," Exhibits 52 and 177 contain key distinguishing characteristics.

In short, EQT failed to turn over crucial damages information during discovery. So the Court froze EQT "where it happily stood" at the time of the Bergonzi deposition. The Court's orders plainly prevented EQT from offering *any* additional damages-related proof. At trial, EQT still attempted to admit Exhibit 52 to prove damages. But EQT had a duty to disclose such information during discovery. Even if EQT did not have Exhibit 52 itself during discovery, the information and data within Exhibit 52 must have been available to EQT if the document proves damages under Count V, as EQT argues. And as this Court previously ruled, it will not "reward[] EQT for its failure to comply with the rules of discovery." [DE 78, p. 6].

EQT presents no clear error or law, manifest injustice, or other substantial reason to set aside the judgment. Instead, EQT rehashes old arguments that this Court already rejected. *Zell*, 2018 WL 334386, at *3. The Court's rulings on Exhibit 52 stand.

**B. Magnum Hunter's NGL Offset**

Next, EQT argues the Court erred in finding Magnum Hunter did not breach the FOAs when it subtracted NGL post-production costs from the total oil and gas royalties it owed to EQT. [DE 124-1, p. 13]. In total, Magnum Hunter owed $776,862.08 in oil and gas royalties. [*Id.*]. From that number, Magnum Hunter subtracted $206,926.36, or the amount that NGL post-production costs exceeded NGL revenue during the same time period. [*Id.* at p. 16]. Thus, Magnum Hunter contended it owed $569,935.72 in royalty payments instead of the full $776,862.08.

The FOAs required Magnum Hunter to remit royalty payments on oil and/or gas "without deductions of any kind." Pls. Trial Exs. 1-11. EQT argued at trial, and argues again now, that Magnum Hunter breached this provision of the FOAs by deducting NGL costs against oil and gas revenues. [DE 124-1, p. 13]. The Court already considered this argument and specifically rejected it in its Findings of Fact and Conclusions of Law. [DE 122, pp. 16-18]. The Court reasoned that offsetting the total gas and oil royalty by the net amount of NGL revenue less NGL post-production costs is not a "deduction" under the FOAs. [*Id.* at p. 17]. Instead, Magnum Hunter simply netted the costs against royalties it owed EQT. This is not a "deduction" but simply the net amount Magnum Hunter owed EQT based on two separate accounts. The Court explained that Magnum Hunter could have sent EQT an invoice for the $206,926.36, "but the net effect is the same." [*Id.* at p. 18].

EQT now wants the Court to reconsider. In particular, EQT contends that the Court's July 2017 Order that found NGLs did not fall under the contract means Magnum Hunter had no right to produce the NGLs at all, and thus EQT has no obligation to pay for the processing costs. [DE 124-1, pp. 14-15]. Because NGLs do not fall under the FOAs, EQT argues, "Magnum Hunter is committing trespass by taking NGLs from EQT's gas stream." [*Id.*]

This is, again, a repackaging of old arguments. For years, Magnum Hunter produced NGLs and paid royalties to EQT. During that time, Magnum Hunter charged EQT costs. And when revenue exceeded costs, EQT received royalty payments. It was only when costs exceeded revenue that NGLs became a net negative to EQT. At trial, Magnum Hunter's witness, Michael Wallen, testified that Magnum Hunter paid, and EQT accepted, NGL royalty payments since 2008 even when NGL costs exceeded NGL revenues. [DE 118, p. 81].

Before trial, the Court ruled that these deductions—that is, Magnum Hunter's subtracting NGL post-production costs from NGL revenues—did not amount to a breach of contract under the FOAs because NGLs are not subject to the FOAs. [DE 77, pp. 19-20]. And because the FOAs do not apply to NGLs, any post-production deductions from NGL royalty payments are not a breach. [*Id.*] NGLs simply fall outside the reach of the agreements.

But when the reverse scenario occurred—that is, when NGL post-production costs exceeded revenue—EQT received no royalty because the balance was negative.  EQT contends that this amounts to a breach because Magnum Hunter then netted the negative amount against other oil and gas royalties, not just NGL royalties.  Given the Court's prior Order, EQT's argument would mean that Magnum Hunter would never breach the FOAs so long as revenue exceeded costs; i.e., as long as EQT continued to receive a royalty.  But, at the point where costs exceeded revenue—and EQT stopped receiving a royalty—Magnum Hunter would suddenly be in breach because it netted the amount against oil and gas royalties.  It is illogical that Magnum Hunter's breach or non-breach under the FOAs would depend on the NGL market—namely how much it cost to produce NGLs and the price at which Magnum Hunter could sell them.  The Court rejects this position.

In short, like its Exhibit 52 argument, EQT disagrees with the Court, but EQT fails to present any clear error of law or need to prevent manifest injustice.  Indeed, EQT fails to present any argument it has not already made to the Court.  And because the Court sees no reason to alter its judgment, EQT's motion is denied.

**C. EQT's Request for Declaratory Relief**

EQT's next argument is quickly disposed of.  EQT asked the Court for a declaration that EQT is (1) entitled to royalty without

deductions of any kind, and (2) entitled to recover all payments for NGLs that Magnum Hunter received under the FOAs. [DE 124-1, p. 16]. The Court denied these requests in its Findings of Fact and Conclusions of Law. [DE 122, pp. 27-29]. The Court will also reject them here.

As discussed at length in this case, NGL deductions were proper because NGLs are not contemplated by the FOAs. [DE 77, pp. 17-19; DE 122, p. 29]. In addition, EQT did not prove damages for improper deductions on oil and gas royalties. [DE 122, pp. 23-24]. As such, a declaration on that claim is improper.

**D. Prejudgment Interest on Cash Payment**

Finally, EQT argues it is entitled to an altered judgment because the Court did not award prejudgment interest on the $1,833,780 Cash Payment. [DE 124-1, p. 18]. But Magnum Hunter made the payment after coming to an agreement with EQT in bankruptcy, not because this Court awarded EQT damages. Indeed, the Cash Payment was made before this case ever came to trial. EQT argues that it must receive prejudgment interest because Magnum Hunter failed to timely remit full payment. But evidence at trial indicated EQT held up the Cash Payment because EQT believed it was entitled to additional amounts related to NGLs. [DE 117, pp. 65-68; DE 118, p. 93]. Thus, the Court did not award prejudgment interest. EQT does not like the Court's ruling, but EQT cannot

19

point to any clear error of law or manifest injustice that requires a new trial or altered judgment on this issue.

IV.

In short, EQT disagrees with the Court. But after trials, parties often are unsatisfied. That is not a grounds for granting a new trial or altered judgment. Accordingly, for the reasons stated herein, EQT's Motion for a New Trial or Altered Judgment is **DENIED**.

This the 8th day of March, 2018.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge